# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

COMPETITOR LIAISON BUREAU, INC.,
NASCAR, INC.,

        Plaintiffs,

-vs-                                            Case No.  6:08-cv-2165-Orl-28GJK

CESSNA AIRCRAFT COMPANY,

        Defendant.

_____/

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the following motions:

| | |
|---|---|
| **MOTION:** | **PLAINTIFFS' MOTION TO EXCLUDE THE SUPPLEMENTAL REPORT AND TESTIMONY OF EXPERT WITNESS RAY CLAXTON (Doc. No. 64)** |
| **FILED:** | **November 5, 2010** |
| | _____ |
| **THEREON** it is **RECOMMENDED** that the motion be **DENIED**. | |

1

| | |
|---|---|
| **MOTION:** | **PLAINTIFFS' MOTION *IN LIMINE* TO EXCLUDE PORTIONS OF THE TESTIMONY OF EXPERT WITNESS RAY CLAXTON (Doc. No. 71)** |
| **FILED:** | **November 16, 2010** |

**THEREON** it is **RECOMMENDED** that the motion be **GRANTED in part and DENIED in part**.

| | |
|---|---|
| **MOTION:** | **PLAINTIFFS' AMENDED MOTION TO EXCLUDE THE AMENDED SUPPLEMENTAL REPORT AND THE TESTIMONY OF EXPERT WITNESS RAY CLAXTON (Doc. No. 89)** |
| **FILED:** | **November 30, 2010** |

**THEREON** it is **RECOMMENDED** that the motion be **DENIED**.

## I.    BACKGROUND.

This case arises from an aircraft accident that occurred on July 10, 2007, near Sanford, Florida.  Doc. Nos. 2, 34-35.  The aircraft (the "Aircraft"), a twin-engine Cessna 310R, which was manufactured by Cessna Aircraft Company ("Cessna") in 1977 (*see* Doc. No. 99-18 at 4), was owned by Competitor Liaison Bureau, Inc. ("CLB") and operated by NASCAR, Inc. ("NASCAR"). Doc. Nos. 2 at 2, 34 at 2, 35 at 2.

On July 9, 2007, during a flight of the Aircraft, the pilot, Andrew Tumicki, reported that the weather radar system was not working.  Doc. No. 99-18 at 6.  Mr. Tumicki attempted to reactivate the weather radar system, but began smelling "electrical components burning."  Doc. No. 99-18 at 6. Mr. Tumicki then disengaged the circuit breaker for the weather radar system and the smell dissipated.  *Id*.  Mr. Tumicki wrote an "operational discrepancy" form stating that

the weather radar system was inoperable. *See* Doc. Nos. 76 at 2 (containing a copy of the original operational discrepancy form); 72-1 at 8. Mr. Tumicki placed the original in the Aircraft's maintenance discrepancy binder and placed the binder on the Aircraft's throttle quadrant in the cockpit. Doc. Nos. 72-1 at 8; 99-18. Mr. Tumicki testified that he reported the incident to NASCAR and gave a copy of the discrepancy report to NASCAR's maintenance personnel. Doc. No. 72-1 at 8. The copy of the discrepancy report is not in NASCAR's records. However, the original was recovered at the crash site. Doc. No. 72-1 at 9-11. Mr. Tumicki was not involved in the July 10, 2007 flight.

On July 10, 2007, shortly after takeoff from Daytona Beach, Florida, the pilots of the Aircraft declared an emergency, stating there was smoke in the cockpit, and diverted to Sanford, Florida. Doc. No. 72-1 at 2. The Aircraft collided with trees and houses, killing the two pilots and three people on the ground, and inflicting other bodily injury and property damage. Doc. No. 64 at 1-2. After the crash and subsequent ground fire, there were very few identifiable pieces of the Aircraft left for inspection and testing.

CLB and NASCAR (hereinafter collectively, "NASCAR") were insured by United States Aviation Underwriters, Inc., Lexington Insurance Company, and Westchester Fire Insurance Company. Doc. Nos. 2, 34-35. Various claims were asserted against NASCAR by injured parties or their representative and, although NASCAR was without knowledge as to who was ultimately responsible for their damages, the claims were paid in full with a reservation of rights to seek reimbursement against the party or parties who were ultimately responsible. Doc. Nos. 2, 34-35. Thereafter, NASCAR, on behalf and for the benefit of the above named insurance companies, filed suit against Cessna asserting negligence (Count I), strict liability (Count II), and breach of warranty (Count III). Doc. Nos. 2, 34-35. NASCAR seeks equitable subrogation,

legal subrogation, indemnity, and contribution.  Doc. Nos. 2, 34-35.

The cause of the July 10, 2007 crash is a central issue in this case. That issue has lead the parties to focus on two of the Aircraft's systems – the propeller syncrophaser and weather radar systems, which are discussed below.  The case presents complex issues of fact and, understandably, the parties have retained numerous experts in various disciplines to assist the jury in resolving those issues.

NASCAR's theory of the case is the Aircraft was manufactured in an unreasonably dangerous manner because polyvinyl chloride plastic material ("PVC") was used as insulation for various wires in the cockpit, including the wires for the Aircraft's propeller syncrophaser system.  Doc. Nos. 109 at 2; 64-1 at 5.[1]  NASCAR maintains that Cessna should have known at the time the Aircraft was manufactured, and did know after the Aircraft was manufactured, that PVC insulated wires were not flame resistant and would create dangerous quantities of toxic fumes when ignited.  Doc. Nos. 109 at 2; 99-18 at 10.  NASCAR asserts that Cessna was negligent in using PVC insulated wires and that such use violates Federal Regulations.  Doc. No. 109 at 2.  Generally, NASCAR maintains that during the July 10, 2007 flight, a short in the wires of the propeller syncrophaser system ignited the PVC insulation leading to large quantities of toxic fumes entering the cockpit, incapacitating the pilots and, ultimately, causing the crash.

Cessna's theory of the case is two-fold.  First, Cessna maintains that: it did not manufacture the Aircraft in a negligent manner; the Aircraft was manufactured pursuant to all certification requirements of the Federal Aviation Administration; Cessna owed no duty to

---

[1]A propeller synchrophaser is an electronic system designed to match the propeller revolutions per minute (RPM) and propeller phase angle on twin-engine airplanes.  Doc. No. 99-18 at 4. The syncrophaser is a "device that automatically coordinates the speed of the engines so that the propellers rotate at the same speed" and pitch.  Doc. No. 73-1 at 7. The Aircraft's propeller syncrophaser system and accompanying wiring was manufactured and installed by Cessna in 1977. *Id.*

NASCAR; and NASCAR's claims are barred by a statute of repose.  Doc. No. 109 at 2.  Second, Cessna maintains that the cause of the crash, or the origin of the in-flight fire, was not the syncrophaser system.  Doc. No. 109 at 3.  Rather, Cessna contends that the fire that caused the July 10, 2007 crash was a continuation of a fire or electric failure of the Aircraft's weather radar system, which occurred during the flight on July 9, 2007.  *Id*.  The weather radar system was manufactured by Benidix-King, Corp. and installed in the Aircraft on May 27, 1988.  Doc. No. 72-1 at 6.  Cessna asserts NASCAR's failure to remedy the problems with the weather radar system caused the crash.  Doc. No. 109 at 3.  The trial term for this case begins on April 1, 2011. Doc. No. 40 at 2.

This Report and Recommendation addresses three motions brought by NASCAR concerning one of Cessna's experts, Dr. Raymond Claxton, Ph.D., a metallurgical and mechanical engineer.[2] Dr. Claxton has offered three reports, or an original report, a supplemental report, and an amended supplemental report. Doc. Nos. 64-1, 64-9, 76-4.  In order to properly frame the issues raised in the motions, it is necessary to discuss the chronology of Dr. Claxton's reports and certain related aspects of the case.

On July 30, 2010, Cessna retained Dr. Claxton as an expert.  Doc. No. 64-1 at 3.  The deadline for NASCAR and Cessna to disclose their expert reports, respectively, were August 13, 2010 and September 13, 2010.  Doc. Nos. 40, 47, 48.  On August 13, 2010, NASCAR served its expert reports, with the exception of Dr. Richard McSwain's expert report.  Doc. No. 76 at 4.  On August 24, 2010, an inspection of the remains of the Aircraft was conducted in Palm Coast, Florida, for the benefit of Cessna's experts, including Dr. Claxton.  Doc. Nos. 64 at 2.   On September 3, 2010, an inspection of various selected components of the Aircraft was conducted

---

[2] Metallurgy is the science or study of metals and their properties in bulk and at the atomic level.  *See The American Heritage Dictionary*, Second College Edition (1985).

at Dr. Claxton's laboratory, Materials Analysis, Inc., in Dallas, Texas.  Doc. No. 64-1 at 4.  On September 13, 2010, Cessna served NASCAR with Dr. Claxton's first expert report (the "Report").  Doc. Nos. 64-1; 64-2; 64-3; 64-4.

Dr. Claxton's Report, based on observation and laboratory testing of syncrophaser harness and the 23 associated wires, concluded that: none of the 23 wires associated with the syncrophaser connecter bore evidence of electrical arching; each of the 23 wires bore evidence of thermal melting; the five fused junctions on the 23 wire syncrophaser connector indicate that the syncrophaser system was electrically de-energized when the melting took place; melting of the 23 wires occurred in the post accident ground fire; all of the avionics wiring in the Aircraft was non-PVC insulated.  Doc. No. 64-1 at 1-12.[3]  Dr. Claxton's Report did not address whether the weather radar system was the likely cause of the in-flight fire on July 10, 2007.  Doc. No. 64-1.

On September 24, 2010, Cessna took the deposition of NASCAR's expert, Dr. Merritt M. Birky, Ph.D.  Doc. No. 82-1.  In Dr. Birky's August 12, 2010 report, he generally opines that in-flight fire that occurred on July 10, 2007, originated in the propeller syncrophaser system and, due to the PVC insulated wire in that system, emitted high concentrations of toxic fumes and smoke into the cockpit, incapacitating the pilots and causing the crash.  Doc. No. 99-16 at 2-16.  On September 29, 2010, an inspection and testing of selected components of the Aircraft, including the syncrophaser system and weather radar system, was conducted at Dr. Richard McSwain's laboratory in Pensacola, Florida.  Doc. Nos. 64 at 3; 99-3.[4]  Dr. Claxton attended the McSwain inspection, participated in, and observed the testing.  Doc. Nos. 64 at 3; 64-5 at 117;

---

[3] In this case, the parties generally refer to the wiring in an around the instrument panel as "avionic wiring."  As applied in Dr. Claxton's Report, the syncrophaser system is not part of the Aircraft's avionics. Doc. No. 64-5 at 30-31.

[4] Although it is not exactly clear from the parties' submissions, at some point in time prior to the September 29, 2010 McSwain inspection, NASCAR notified Cessna that Dr. McSwain would be offering a rebuttal expert report. Doc. No. 76 at 3.

64-9 at 3; 98 at 7.   While Dr. McSwain's initial report (Doc. No. 99-3) does not address the weather radar system, it was inspected and photographed during the McSwain inspection.   Doc. Nos. 64-5 at 14-18; 98 at 7.

On October 8, 2010, Cessna deposed another NASCAR expert, Douglas Stimpson.   Doc. No. 85.   In his report, Mr. Stimpson opines that the weather radar system was properly deactivated on July 9, 2007, remained deactivated during the July 10, 2007 flight, removing or performing maintenance on the weather radar system would not have averted the crash, the source of the in-flight fire was the propeller syncrophaser system, and the Aircraft crashed because the pilots were overcome by toxic fumes emitted by the burning of the PVC insulated wiring.   Doc. No. 99-20 at 14.   During his deposition, Mr. Stimpson stated that the failure of the weather radar weather system on July 9th and the crash of July 10th were not necessarily unrelated because the failure of the weather radar system on July 9th was most likely the result of the problems coming from the propeller syncrophaser system.   Doc. No. 85-2 at 4-5.

On October 15, 2010, Cessna served NASCAR with Dr. Claxton's supplemental report (the "Supplemental Report").   Doc. No. 64-9.[5]   In the Supplemental Report, Dr. Claxton states that his original findings and conclusions regarding the syncrophaser system remain unchanged, but he added an additional basis for concluding that the syncrophaser wires melted due to thermal heating rather than electrical activity.   Doc. No. 64-9 at 5.   Dr. Claxton opined that the presence of calcium and sulfur on the insulation remnants of the insulation on the syncrophaser wires, but the absence of those elements on the bare wires themselves, is consistent with the syncrophaser harness burning during the post-impact ground fire.   Doc. No. 64-9 at 4-5.   Dr.

---

[5] Mr. Stimpson's deposition was not available at the time of Dr. Claxon's October 15, 2010 Supplemental Report. Doc. No. 76 at 7.   Cessna acknowledges that Dr. Claxton had not read Dr. Birky's deposition prior to issuing his Supplemental Report.   Doc. No. 98 at 2.

Claxton also offered a new opinion regarding the weather radar system. Doc. No. 64-9 at 5-7. Dr. Claxton opined that the circuit board associated with the weather radar system suffered electrical failure and burned in-flight, on July 9th and July 10th, and was the "root cause of smoke in the cockpit during the final flight." Doc. No. 64-9 at 8. Dr. Claxton also offered observations and/or criticisms of Dr. McSwain's September 29, 2010 testing. Doc. No. 64-9 at 3-5.

On October 18, 2010, NASCAR served Cessna with Dr. McSwain's rebuttal expert report (the "McSwain Report"). Doc. No. 99-3 at 2-14. The McSwain Report concludes that the wires of syncrophaser system utilized PVC insulation. Doc. No. 99-3 at 8-9. In the "Case Literature" section of the McSwain Report, he lists the Supplemental Report has having been reviewed as part of his analysis. Doc. No. 99-3 at 14.

On October 20, 2010, NASCAR deposed Dr. Claxton regarding his testing, observations, and opinions contained in the Report and Supplemental Report. Doc. No. 64-5. On October 25, 2010, Cessna deposed Dr. McSwain regarding the McSwain Report as well as Dr. Claxton's Supplemental Report. Doc. No. 98-3 at 76-82. Dr. McSwain stated that he disagreed with Dr. Claxton's findings in the Supplemental Report regarding the weather radar system; Dr. McSwain had performed additional testing; and he would be performing more additional testing. *Id.*

On November 12, 2010, NASCAR served Cessna with Dr. McSwain's supplemental report (the "McSwain Supplemental Report") wherein he disputes Dr. Claxton's Supplemental Report opinion that the weather radar system, specifically the weather radar antenna circuit board, underwent an in-flight fire on July 10th. Doc. No. 98-5 at 1-4. Dr. McSwain opines that the weather radar circuit board was damaged by the post-impact ground fire. *Id.*

On November 19, 2010, Cessna served NASCAR with Dr. Claxton's amended

8

supplemental report (the "Amended Supplemental Report").  Doc. No. 89-3.  In the Amended

Supplemental Report, Dr. Claxton changes the thermal degradation temperature of Teflon, which

Cessna maintains was a result of a factual error contained in a well-known publication Dr.

Claxton relied upon.  *See* Doc. Nos. 89-3 at 6; 98 at 3.  Although the underlying opinions in the

Report and Supplemental Report are unchanged, the Amended Supplemental Report does

contain certain changes regarding Dr. Claxton's analysis of the weather radar system and his

related opinions.  *Compare* Doc. No. 64-9 at 6 *with* Doc. No. 89-3 at 6.[6]

On November 23, 2010, Dr. McSwain was deposed again and testified about Dr.

Claxton's Supplemental Report and Amended Supplemental Report.  Doc. Nos. 64-12 at 2; 98 at

9.  Neither party provided the Court with a transcript of Dr. McSwain's November 23, 2010

deposition.

## II.  <u>MOTIONS TO STRIKE.</u>

On November 6, 2010, NASCAR filed a Motion to Exclude the Supplemental Report and

Testimony of Expert Witness Ray Claxton (the "Motion to Strike").  Doc. No. 64.  NASCAR

maintains that the Supplemental Report is untimely because it was served after the September

13, 2010 deadline for Cessna to disclose its experts' reports.  Doc. No. 64 at 5.  NASCAR

contends that the Supplemental Report is neither a rebuttal report as contemplated under Rule

26(a)(2)(C)(ii), Federal Rules of Civil Procedure, nor a supplemental report as contemplated

under Rule 26(e), Federal Rules of Civil Procedure.  Doc. No. 64 at  5-8 (citing *Keener v. United*

*States*, 181 F.R.D. 639, 640 (D. MT 1998) (A report constitutes rebuttal evidence only if it is

---

[6] For example, in the Supplemental Report Dr. Claxton states: "The important conclusion that can be drawn from the fact that the antenna circuit board was melted and severely heat damaged while the wire insulation on one side and the aluminum on the other side remained undamaged is that the weather radar antenna assembly <u>was not involved in the post-impact ground fire</u>."  Doc. No. 64-9 at 6 (emphasis added).  In the Amended Supplemental Report, Dr. Claxton states that: "The important conclusion that can be drawn . . . is that weather radar antenna assembly <u>may not have been involved in the post impact ground fire</u>."  Doc. No. 89-3 at 6 (emphasis added).  That is one example of how Dr. Claxton refined the language in his most recent report.  *Compare* Doc. No. 64-9 at 6-8 *with* 89-3 at 6-8.

intended solely to contradict or rebut evidence on same subject matter identified by other party, and a supplemental report is intended to correct inaccurate or incomplete information)). NASCAR requests that pursuant to Rule 37(c)(1), Federal Rules of Civil Procedure, the Court enter an order striking the Supplemental Report and prohibit Dr. Claxton from testifying at trial concerning any matter contained therein.  Doc. No. 64 at 4, 11-12.  NASCAR argues that Cessna lacks substantial justification for failing to timely disclose the Supplemental Report and that failure is not harmless.  Doc. No. 64 at 8-12.

On November 19, 2010, Cessna filed a response to the Motion to Strike arguing that the Supplemental Report was a timely rebuttal report of the opinions expressed in Dr. Birky and Mr. Stimpson's depositions, and a rebuttal of September 29, 2010 McSwain testing.  Doc. No. 76 at 4-9.  Cessna also maintains that even if the Supplemental Report is untimely, it is harmless to NASCAR because it had an opportunity to: present the Supplemental Report to its experts; depose Dr. Claxton as to the opinions contained in the Supplemental Report; have its experts conduct their own tests; and offer a rebuttal report.  Doc. No. 76 at 14.  On December 17, 2010, NASCAR filed a reply to Cessna's response arguing that the Supplemental Report is not a rebuttal report because, during his deposition, Dr. Claxton admitted that the Supplemental Report contained new opinions and was not intended to contradict or rebut any prior opinions.  Doc. No. 103 at 1-4 (citing Doc. No. 64-5 at 14-16).

On November 30, 2010, NASCAR filed an Amended Motion to Exclude the Amended Supplemental Report and to Limit the Testimony of Expert Witness Ray Claxton (the "Second Motion to Strike").  Doc. No. 89.  NASCAR maintains that the Amended Supplemental Report is also untimely, there is no substantial justification for Cessna's failure to timely disclose the report, and Cessna's failure is not harmless.  Doc. No. 89 at 12-18.  NASCAR states in order to

10

properly address the Amended Supplemental Report, it will be necessary for each of NASCAR's experts to offer new opinions addressing the Amended Supplemental Report, which will require a new round of depositions.  Doc. No. 89 at 13-14.  NASCAR acknowledges that the Amended Supplemental Report corrects inaccuracies contained in the Supplemental Report, which would normally constitute a proper supplemental report under the Federal Rules of Civil Procedure. However, NASCAR argues the Supplemental Report is untimely and should be stricken.  *Id*. at 16-17.  Pursuant to Rule 37(c)(1), Federal Rules of Civil Procedure, NASCAR requests that the Court enter an order striking the Amended Supplemental Report and excluding any testimony at trial concerning it.  Doc. No. 89 at 18.

On December 13, 2010, Cessna filed a response to the Second Motion to Strike.  Doc. No. 98.  Cessna maintains that the Amended Supplemental Report addressed a factual error contained in the Supplemental Report regarding the thermal degradation temperature of Teflon, and that Dr. Claxton's substantive opinions did not change. Doc. No. 98 at 3. Cessna maintains that if the Supplemental Report and Amended Supplemental Report are untimely, the error is harmless to NASCAR because Dr. McSwain reviewed the Supplemental Report and cited it in the McSwain Report; Dr. McSwain was deposed regarding the Supplemental Report; the McSwain Supplemental Report addressed the Supplemental Report; and Dr. McSwain was deposed again after the Amended Supplemental Report was served on NASCAR and addressed both the supplemental reports.  Doc. No. 98 at 9.

## III.    ANALYSIS OF MOTIONS TO STRIKE.

Federal Rule of Civil Procedure 37(c)(1) states:  "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, <u>unless the</u>

11

failure was *substantially justified* or is *harmless*." Fed. R. Civ. P 37(c)(1) (emphasis added).

"The district court has broad discretion to admit or exclude untimely submissions under this rule." *Lambert v. Monaco Coach Corp.*, No. 8:04-cv-608-T-30TBM, 2005 WL 5960175, at *1 (M.D. Fla. Feb. 10, 2005) (citing *Bearint v. Dorel Juvenile Group, Inc.*, 389 F.3d 1339 (11th Cir. 2004)).

"'Substantial justification requires justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request. The proponent's position must have a reasonable basis in law and fact. The test is satisfied if there is [a] genuine dispute concerning compliance.'" *Earle v. State Farm Fla. Ins. Co.*, No. 6:07-cv-17-Orl-31DAB, 2008 WL 53916, at *1 (M.D. Fla. Jan. 2, 2008) (quoting *Home Design Services, Inc. v. Hibiscus Homes of Florida, Inc.*, Civ. No. 6:03cv1860-Orl-19KRS, 2005 WL 2465020, *2 (M.D. Fla. Oct.6, 2005) (quoting *Ellison v. Windt*, No. 6:99-cv-1268-Orl-KRS, 2001 WL 118617, at *2 (M.D. Fla. Jan. 24, 2001)).

If a party lacks substantial justification for failing to timely disclose an expert report, then that party is not permitted to use that evidence at trial, unless the failure is harmless.  Rule 37(c)(1), Federal Rules of Civil Procedure.  "In evaluating whether the failure to disclose a witness is harmless, the Eleventh Circuit considers '(1) the importance of the testimony; (2) the reason for the appellant's failure to disclose the witness earlier; and (3) the prejudice to the opposing party if the witness had been allowed to testify.'" *Hosea v. Langley*, No. Civ. A. 04-0605-WS-C, 2006 WL 314454, at *4 (S.D. Ala. Feb. 6, 2006) (quoting *Bearint ex rel. Bearint v. Dorell Juvenile Group, Inc.*, 389 F.3d 1339, 1353 (11th Cir.2004)). "Failure to timely make the required expert witness disclosures is harmless when the party entitled to the disclosure suffers no prejudice." *Earle*, 2008 WL 53916, at *1.

This case was filed in 2008, but Cessna did not retain Dr. Claxton until July 30, 2010. Doc. No. 64-1 at 3.  Dr. Claxton did not inspect or conduct an analysis of the weather radar system until after September 13, 2010, the date Cessna's expert disclosures were due.  *See* Doc. No. 64-5 at 15-20.  Accordingly, it is recommended that the Court find the supplemental reports are untimely and Cessna has failed to demonstrate substantial justification for failing to timely disclose them.

After Dr. Claxton issued his Report, the components of the Aircraft were inspected by Drs. McSwain and Claxton, on September 29, 2010.  Dr. Claxton's Supplemental Report addressing the weather radar system was served only two weeks later, on October 14, 2010. Doc. No. 64-9.  Dr. McSwain reviewed the Supplemental Report as part of his first expert report, the McSwain Report, which was completed on October 18, 2010, two days prior to Dr. Claxton's deposition.  Doc. No. 99-3 at 14. NASCAR deposed Dr. Claxton about his Supplemental Report. *See* Doc. No. 64-5.  On October 25, 2010, Dr. McSwain was deposed concerning the Supplemental Report.  Doc. No. 98-3 at 76-82.  Thereafter, on November 12, 2010, Dr. McSwain offered a supplemental report, the McSwain Supplemental Report, addressing the weather radar system.  Doc. No. 98-5.  During Dr. McSwain's supplemental deposition on November 23, 2010, he was questioned concerning the Amended Supplemental Report.  *See* Doc. No. 64-12 at 2.  Although the Supplemental Report was untimely and not substantially justified, NASCAR had sufficient information and opportunity to submit any new bases or opinions contained therein to their expert for a rebuttal opinion and, in fact did so.[7]  Furthermore, NASCAR has deposed Dr. Claxton about his Supplemental Report.  The Amended Supplemental

---

[7] NASCAR generally alleges prejudice or harm resulting from the supplemental reports, but fails to identify any specific harm resulting from the same.  Doc. No. 89 at 13-14.  Given the facts set forth above, it is clear NASCAR had the opportunity to avoid any such harm and, in fact, rightfully took action to do so.

Report was properly provided to correct an error and does not contain any new or otherwise materially altered opinions. Accordingly, it is recommended that the Court find the failure to timely produce the supplemental reports at issue is harmless and NASCAR has suffered no prejudice.

## IV.   *DAUBERT* MOTION.

On November 16, 2010, NASCAR filed a Motion In Limine to Exclude Portions of the Testimony of Expert Ray Claxton pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) (the "Daubert Motion").  Doc. No. 71.  NASCAR argues that Dr. Claxton should be excluded from offering opinions concerning: 1) the Aircraft's certification basis and compliance with Civil Air Regulations; 2) the source or origin of the in-flight fire and smoke; and 3) the weather radar system, including whether the damage to the weather radar circuit board occurred in-flight or during the post-impact ground fire.  Doc. No. 71 at 5-11.  NASCAR maintains that Dr. Claxton lacks the necessary expertise to offer opinions as to the Aircraft's certification and compliance with Civil Air Regulations, and cause and origin of the fire.  Doc. No. 71 at 5-6.  NASCAR asserts that Dr. Claxton's opinion that the weather radar system burned in-flight, produced the smoke in the cockpit, and was not likely damaged in the post-impact ground fire lacks factual support.  Doc. No. 71 at 6-9.  Finally, NASCAR contends that Dr. Claxton's opinions concerning the weather radar system are based on speculation rather than reliable scientific principles.  Doc. No. 71 at 9-10.[8]

On December 16, 2010, Cessna filed a response to the Daubert Motion.  Doc. No. 96. Cessna asserts that Dr. Claxton will not offer any opinions concerning the certification basis of the Aircraft, including whether the Aircraft was properly certified by the Federal Aviation

---

[8] NASCAR does not request the exclusion Dr. Claxton's opinions regarding the propeller syncrophaser system. *See* Doc. No. 71.

Administration.  Doc. No. 96 at 10-11.  However, Cessna contends that Dr. Claxton possess the requisite expertise to offer an opinion as to whether the PVC insulated wiring installed on the Aircraft meets the Civil Air Regulations requirement of "slow burning," "flame resistant wiring" that does not "emit dangerous or toxic fumes."  Doc. No. 96 at 11.  Cessna also asserts that Dr. Claxon has the requisite knowledge, skill, experience, training, and education to offer opinions as to whether the weather radar circuit board burned in-flight or after the post-impact ground fire. Doc. No. 96 at 12-13.

Cessna argues that Dr. Claxton's opinions regarding the weather radar system are supported by sufficient facts.  Doc. No. 96 at 13-17.  According to Cessna, Dr. Claxton's opinions are based upon the failure of the weather radar system on July 9, 2007 and the smell of "electrical components burning," and his own laboratory analysis of the weather radar system. Doc. No. 96 at 13-7. Finally, Cessna maintains that Dr. Claxton's opinions regarding the weather radar system are supported by sound scientific methods and principles.  Doc. No. 96 at 18.

A. Law.

Federal Rule of Evidence 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.  In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) and *Daubert*, 509 U.S. 579, the Supreme Court held that the trial court must perform a "gatekeeper" function designed to ensure that any and all expert testimony is both relevant and reliable.  "The burden of

laying a proper foundation for the admissibility of an expert's testimony is on the party offering

the expert, and the admissibility must be shown by a preponderance of the evidence." *Hall v.*

*United Ins. Co. of America*, 367 F.3d 1255, 1261 (11th Cir. 2004).  The party offering the expert

has "the burden to show that his expert [is] 'qualified to testify competently regarding the

matters he intend[s] to address; [] the methodology by which the expert reache[d] his conclusions

is sufficiently reliable; and [] the testimony assists the trier of fact.'"  *McCorvey v. Baxter*

*Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002) (quoting *Maiz v. Virani*, 253 F.3d 641,

664 (11th Cir. 2001)).

In *Daubert*, the Supreme Court identified the following non-exclusive list of factors a

court should consider when determining the admissibility and reliability of expert testimony:

1) whether the expert's methods or techniques can be or have been tested;
2) whether the technique, method, or theory has been subject to peer review and publications;
3) whether the known or potential rate of error of the technique or theory when applied is acceptable; and
4) whether technique, method, or theory has been generally accepted in the scientific community.

509 U.S. 579, 594-95 (1993).  In *Kumho Tire Co.*, the Supreme Court held that the *Daubert*

factors applied not only to expert testimony based on scientific knowledge, but also to expert

testimony based on general principles, technical knowledge, and other specialized knowledge.

526 U.S. 137, 141 (1999).  Nonetheless, the trial court's "gatekeeping" function "'inherently

require[s] the trial court to conduct an exacting analysis' of the *foundations* of expert opinions to

ensure they meet the standards for admissibility under Rule 702."  *U.S. v. Frazier,* 387 F.3d

1244, 1260 (11th Cir. 2004) (quoting *McCorvey*, 298 F.3d at 1257) (emphasis supplied).

However, it is not the province of the trial court to make "ultimate conclusions as to the

persuasiveness of the proffered evidence."  *Quiet Technology DC-8 v. Hurel-Dubois UK Ltd.*,

16

326 F.3d 1333, 1341 (11th Cir. 2003).   "Quite the contrary, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'"   *Quiet Technology*, 32 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596).

For instance, if an analysis or study is based on inaccurate date, such flaws are more appropriate for cross-examination.  *See Quiet Technology*, 326 F.3d 1333, 1345 (11th Cir. 2003) (citing *Daubert*, 509 U.S. at 596).  "[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Quiet Technology*, 326 F.3d at 1345 (quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002)).   According to the Supreme Court, the "failure to include variables will affect the analysis' probativeness [rather than] its admissibility." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986).   Thus, "[s]o long as the expert's testimony rests upon 'good grounds,' it should be tested by the adversary process-competing expert testimony and active cross-examination-rather than excluded from jurors['] scrutiny for fear that they will not grasp its complexities or satisfactory [sic] weigh its inadequacies." *Quiet Technology*, 326 F.3d at 1345 (internal citations and quotations omitted).

B. <u>Analysis</u>.

Dr. Claxton received his Ph.D. in metallurgical engineering in 1971.  Doc. No. 64-4 at 8. His curriculum vitae states that he has:

> Thirty-five years combined experience in failure analysis, research, mechanical and metallurgical engineering, manufacturing and business management.   Specific areas of expertise include the following: failure analysis; stress analysis; corrosion; fractography and metallography; metallurgical processing; metallurgical structure/property relationships; machine design; scanning electron microscopy; chemical analysis; mechanical testing; combustion

17

and heat transfer.  Licensed in the states of Texas and Alabama.

Doc. No. 64-4 at 8.  Dr. Claxton hold numerous patents, belongs to many professional societies, has authored numerous publications, and has lectured and taught classes on aviation accidents.

Doc No. 64-4 at 9-10.  Dr. Claxton has previously testified at trial and at depositions as an expert in metallurgical engineering.  Doc. No. 64-4 at 12-21.

Dr. Claxton's list of reviewed materials, inspections, methodologies, testing, analysis, and opinions are set forth in his reports. Doc. Nos. 64-1; 89-3.[9]  As part of his analysis, Dr. Claxton reviewed videos and photos of the accident site; the cockpit voice recordings; the depositions of numerous witnesses – including Mr. Tumicki's testimony regarding his July 9, 2007 flight; the National Transportation Safety Board's reports concerning the crash; the Cessna Mishap Report and associated photographs of the crash; other experts' reports; military wire specifications; Federal and Civil Air Regulations; various technical papers, reference texts, and industrial product references on wire, wire insulation, and wire flammability; and photos of the propeller syncrophaser system and weather radar system.  Doc. Nos. 64-1 at 4-5; 89-3 at 5-20. Dr. Claxton also conducted two non-destructive inspections of selected components of the Aircraft;  laboratory  analysis  of  arc-melted  wires;  laboratory  analysis,  including  Energy Dispersive Spectroscopy ("EDS"), EDS analysis in an scanning electron microscope ("SEM"), and Fourier Transform Infrared ("FTIR") spectroscopic analysis of insulated wires from samples of an exemplar aircraft and of wires from the Aircraft's syncrophaser system; laboratory analysis of a single wire 12 gauge wire salvaged from the crash site; photographic analysis of the weather

---

[9] The reason all of Dr. Claxton's opinions are not solely contained in the Amended Supplemental Report is because Dr. Claxton's opinions regarding the propeller syncrophaser system did not change between the Report and Supplemental Report – although Dr. Claxton did provide an additional basis for his opinion regarding that system in his Supplemental Report – and Dr. Claxton did not restate his original opinions in the Supplemental Report. *See* Doc. Nos. 64-1; 64-9; 89-3.

radar circuit board; and EDS analysis of the sheet metal where the weather radar circuit board was mounted.  Doc. Nos. 64-1 at 5-11; 89-3 at 3-20.

       1.   Aircraft Certification and Compliance with Civil Air Regulations.

Attached as Appendix A to the Report, Dr. Claxton provides an "Analysis of the Type Certificate Requirements for Electrical Cable," wherein he describes the wiring originally installed on the Aircraft, related Federal and Civil Air Regulations, and industry flammability standards for wiring.  Doc. No. 64-2 at 14-17.  Dr. Claxton concludes:

> The <u>applicable certification basis</u> for the involved aircraft require that the wiring be "in accordance with recognized standards for electric cable of a slow burning type. . . ." The material installed in the involved aircraft at the time of manufacture was produced in accordance with MIL-W-5086/7, a valid military specification with a requirement that the supplied product <u>burn slower than a specified rate</u>.  Both the test method and allowable maximum burn rate required by the cited military specification were consistent with the "slow burning rating" of widely-accepted industrial standard UL94-HB.  <u>The burn characteristics of the wiring installed in the involved aircraft at the time of manufacture were in accordance with the certification bases contained in the applicable Type Certificate</u>.

Doc. No. 64-2 at 15-16 (emphasis added).  Thus, in Appendix A of the Report, Dr. Claxton concludes that the Aircraft, at the time of manufacture, met the required certification basis under the Civil Air Regulations.  Doc. No. 64-2 at 15.

NASCAR seeks to exclude Dr. Claxton from offering any opinions regarding the Aircraft's certification basis or compliance with the Civil Air Regulations because Dr. Claxton lacks the requisite expertise.  Doc. No. 71 at 5-6.  Cessna responds that it "has no intention of using Dr. Claxton to offer legal opinions as to whether this [A]ircraft was properly certified by the [Federal Aviation Administration]."  Doc. No. 96 at 11.  However, Cessna goes on to state that Dr. Claxton has the expertise necessary to testify as to whether the Aircraft's wiring was

manufactured in compliance with the Civil Air Regulations, which requires slow burning, flame resistant wiring that does not emit dangerous quantities of toxic fumes.  Doc. No. 96 at 11-12.

During Dr. Claxton's deposition, the following exchanges occurred:

Q.    [D]o you intend to offer opinions in this case on the certification basis of this [A]ircraft?

A.    No, I don't. . . . We did work in that.

Q.    I understand, and I wanted to ask you about that, because it was an appendix to your report.

A.    That's right.

Q.    But I also note that Cessna has a certification expert, Mr. Burnett, who holds himself out as being qualified in that area.

A.    Yes.

Q.    So you don't see that as part of your function in this case.

A.    Well, our function in this case - - before Mr. Burnett was engaged, there was apparently an allegation that surfaced that - - something to the effect that the [A]ircraft didn't meet the - - didn't meet the proper federal regs when it was first manufactured.  And someone needed to investigate that, and I offered to, not as a reg[ulations] expert, but you don't need to be a [regulations] expert to dig up the [regulations] and see what [regulations] the [A]ircraft was supposed to be manufactured to and whether it was, in fact, manufactured to those [regulations] and what [regulations] it was not manufactured to.  And that's basically what we did, and we put together a package that was then to be transferred to the person who was going to be doing the testifying and offer the opinions on regulations.

Q.    Okay.  So, in that regard, there is an appendix to your report - - or it's not really an appendix, it's a technical . . . file notes.

A.    Well, it is Appendix A to our report. . . .

Q.    My question to you is this: Was this something that you prepared simply to furnish to Mr. Burnett, so he could use that as a basis for testifying, or do you yourself plan to give opinions in this case regarding the certification basis of the [A]ircraft?

A.    I don't anticipate being asked any questions about certification basis.  If asked questions about this particular document, I could probably answer them, but I'm not going to offer myself as a certification expert.

Q.    Now, this particular document - - by "this particular document," I'm again talking about [Appendix A], how was this prepared in your office?

A.    An engineer under my direction researched the subject and prepared the document with the attachments. . . .

> Q.    Do you know what he did to prepare this document, what sort of research he may have done?
>
> A.    He researched - - I don't know the details, but <u>from the document itself, it seems that he looked at the type certificate for the aircraft and saw the certifications to which the aircraft was to be manufactured, dug up those certifications, looked at them, then looked at the allegation.</u>   There was some reference to a [regulation] in the allegation, and he looked that up and, you know, saw that that was not part of the [regulations] to which the [A]ircraft was manufactured.  <u>And I don't think any opinions are in here</u>, I just think we just - - <u>I think we just presented all the data and the facts, and the purpose of it was just to combine all those findings, if you will, into one document so they could be turned over to others</u>.
>
> Q.    <u>Have you done any independent research into the certification basis of the aircraft, other than what [was] provided [by] you in [Appendix A]</u>?
>
> A.    <u>No, I have not</u>.
>
> Q.    And I notice <u>when I look at your actual . . . report - - when I go to the conclusions, I really don't see any conclusions about this aspect of the case, the certification [basis]. . . . And the question is, since you did not provide an opinion in your report as to the certification, this would not be your intention to provide such an opinion at trial</u>.
>
> A.    <u>That's correct</u>.

Doc. No. 64-5 at 7-10 (emphasis added).

The stated purpose of Appendix A is to address whether or not the Aircraft, as manufactured, meets the certification basis under the Civil Air Regulations, which includes having wiring that is "slow burning" and does not "emit dangerous or toxic fumes."  Doc. No. 64-2 at 14-17.  Appendix A concludes that the Aircraft met the required certification basis.  Doc. No. 64-2 at 15-16.  NASCAR seeks to exclude Dr. Claxton from offering any opinions regarding the Aircraft's certification basis or compliance with the Civil Air Regulations because Dr. Claxton lacks the requisite expertise.  Doc. No. 71 at 5-6.

As set forth above, Dr. Claxton acknowledged that he is not an expert in certification bases and will not offer himself as such.  Doc. No. 64-5 at 7-8.  Dr. Claxton has also

acknowledged that Appendix A directly addresses whether or not the Aircraft met the certification basis under the Civil Air Regulations at the time it was manufactured. *Id.* Aside from Appendix A, neither the Report nor Amended Supplemental Report contain any opinions concerning the Aircraft's certification basis or any discussion of whether or not the wiring installed could be considered slow burning under the Civil Air Regulations. *See* Doc. Nos. 64-1; 89-3. Dr. Claxton testified that although Appendix A addresses the certification basis of the Aircraft, he does not think it contains any opinions and it was intended to be turned over to others. Doc. No. 64-5 at 7-10. Moreover, Cessna has a certification expert, Mr. Burnett, who is qualified to testify about the certification basis of the Aircraft. Accordingly, it is recommended that the Court find that Dr. Claxton lacks the necessary expertise to offer an opinion regarding the Aircraft's certification basis or of any matter contained in Appendix A, and that any such testimony should be excluded.[10]

### 2.   Weather Radar System.

NASCAR seeks to exclude Dr. Claxton from testifying about his analysis and opinions of the weather radar system because he lacks expertise regarding analysis of fire cause and origin, his opinions are not supported by sufficient facts, and because his opinions are mere speculation. Doc. No. 71 at 6-10. Dr. Claxton acknowledged in his deposition that he does not hold himself out as an expert in fire cause or origin. *See* Doc. No. 64-5 at 46. Dr. Claxton does have thirty-five years experience in the study and application of mechanical and metallurgical engineering, including failure analysis. Doc. No. 64-4 at 8. In this case, Dr. Claxton has conducted an analysis of the propeller syncrophaser system and weather radar system to determine whether

---

[10] Furthermore, there is no indication Dr. Claxton has any expertise regarding polymer wire insulation and/or determining what constitutes dangerous or toxic fumes.

they burned electrically while in-flight, or thermally while on the ground.[11]   After conducting an analysis of the weather radar system, Dr. Claxton concluded weather radar system likely suffered an in-flight electric fire because the weather radar circuit board was melted and severely heat damaged, but the surrounding wire insulation and aluminum sheet remained largely undamaged. Doc. No. 89-3 at 6.  Thus, while a post-impact ground fire cannot be completely ruled out, Dr. Claxton concluded that the absence of damage to the surrounding wire insulation and aluminum sheet made it less likely that the damage to the weather radar system occurred in the ground fire.[12]  Dr. Claxton's opinions relate directly to his training and experience as a mechanical and metallurgical engineer.  Accordingly, it is recommended that the Court find that Dr. Claxton has the expertise to render opinions about the origin or cause of the in-fight fire.

Dr. Claxton based his opinions regarding the weather radar system upon physical and photographic inspection of the system, laboratory testing of the aluminum sheet, Mr. Tumicki's description of the July 9, 2007 failure of the weather radar system, and the voice recordings and transcript of July 10, 2007 flight.  Doc. No. 89-3 at 3-7.  It is recommended that the Court find that Dr. Claxton's opinion is based upon sufficient facts and data.  Dr. Claxton's methods, techniques, and ultimate opinions can and have been tested by other experts, namely Dr. McSwain.   If Dr. Claxton's methods, techniques, and opinions are flawed or contain inadequacies, then they are more appropriate for cross-examination and competing expert testimony.   Accordingly, it is recommend that the Court find that Dr. Claxton's opinions concerning the weather radar system are the product of reliable principles and methods, rather

---

[11]Dr. Claxton's analysis of the propeller syncrophaser system, which is not challenged by NASCAR in this Daubert Motion, concluded that the burning of the propeller syncrophaser system most likely occurred in the post-impact ground fire due to the lack of electric fire evidence.  Doc. No. 64-1.

[12] Dr. Claxton opined that if the weather radar system had burned in the post-impact ground fire, then due to thermal degradation temperatures of aluminum and the Teflon insulated wire surrounding the weather radar circuit board, he would have expected to see greater damage to the surrounding components.  Doc. No. 89-3 at 6-8.

than mere conjecture, and will assist the trier of fact in this case.

**V.     CONCLUSION.**

Based upon the forgoing, it is **RECOMMENDED** that the Court:

1.   **DENY** the Motion to Strike (Doc. No. 64);

2.   **DENY** the Second Motion to Strike (Doc. No. 89)

3.   **GRANT in part and DENY in part** the Daubert Motion (Doc. No. 71) as follows:

    a.   **GRANT** the Daubert Motion to extent Dr. Claxton should be precluded from offering opinions as to the Aircraft's certification basis or any matter contained in Appendix A (Doc. No. 64-2 at 14-17) because he lacks the requisite expertise; and

    b.   **DENY** the remainder of the Daubert Motion because Dr. Claxton's opinions are based on sufficient facts or data, are the product of reliable principles and methods, and will assist the trier of fact.

Failure to file written objections to the proposed findings and recommendations contained in this report **on or before Friday, March 11, 2011** shall bar an aggrieved party from attacking the factual findings on appeal.

**Recommended** in Orlando, Florida on March 4, 2011.

_____
GREGORY J. KELLY
UNITED STATES MAGISTRATE JUDGE

Copies to:
**Presiding District Judge**
Counsel of record
Unrepresented parties