# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**COMPETITOR LIAISON BUREAU, INC.,**
**NASCAR, INC.,**

     **Plaintiffs,**

-vs-              Case No.  **6:08-cv-2165-Orl-28GJK**

**CESSNA AIRCRAFT COMPANY,**

     **Defendant.**

_____/

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

   This cause came on for consideration without oral argument on the following motion:

| | |
|---|---|
| **MOTION:** | **PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE PORTIONS OF THE TESTIMONY OF EXPERT WITNESS NORMAN ALVARES (Doc. No. 73)** |
| **FILED:** | **November 18, 2010** |
| | _____ |
| **THEREON** it is **RECOMMENDED** that the motion be **DENIED**. | |

## I.  BACKGROUND.

   Because the relevant background facts and definitions are largely set forth in the Court's prior Report and Recommendation, the Court incorporates the background facts contained in Docket Entry No. 121. This Report and Recommendation concerns NASCAR's Motion In Limine to Exclude Portions of the Testimony of Expert Witness Norman Alvares (the "Motion"),

a fire cause and origin expert retained by Cessna.  Doc. No. 73.   In the Motion, NASCAR seeks to exclude Mr. Alvares's opinions concerning the weather radar system on the basis that they are not supported by sufficient facts and are not the product of reliable scientific principles and methods pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

## II.     <u>THE REPORT</u>.

On June 19, 2008, Cessna retained Norma Alvares as a fire cause and origin expert.  Doc. Nos. 73-1 at 3; 73-2 at 7.  Mr. Alvares is a fire scientist and fire protection engineer and has over fifty year of experience in fire research, fire protection engineering, heat transfer, thermal physics, combustion science, and optical properties of surfaces.  Doc. Nos. 73-1 at 14-16; 73-2 at 6.   Mr. Alvares belongs to a number of professional societies and institutions related to his chosen field.  Doc. No. 73-1 at 16.  Mr. Alvares has authored or co-authored over one hundred studies and/or publications.  Doc. No. 73-1 at 17-26.  Mr. Alvares has been deposed or testified as an expert with regard to fire accident reconstruction numerous times, including cases involving in-flight fires.  Doc. No. 73-2 at 12-16.[1]

Mr. Alvares offers the following opinions in his report:

➢  The appearance of all the wires of the recovered syncrophaser harness are consistent with copper conductors exposed to an intense exposure fire;

➢  The unidentified 0.09 inch diameter [12 or 14 gauge] wire with bead[ing] may or may not be aircraft wire.  If it is aircraft wire, there is no way to distinguish if it is a cause or victim bead[ing];[2]

---

[1]NASCAR's Motion does not challenge Mr. Alvares qualifications as an expert in fire cause and origin.  *See* Doc. No. 73.

[2] In his report, Mr. Alvares defines cause beading as a condition produced by electric arcs that cause a fire, and he defines victim beading as beading produced as a result of a fire.  Doc. No. 73-1 at 8.

> ➢ The cause of the in-flight fire [in the Aircraft] is more likely than not associated with the weather radar system and/or wiring;
>
> ➢ The ignition cause is more likely than not an overheated contact or connector associated with the weather radar system;
>
> ➢ There is no available evidence to define the origin of the in-flight fire.

Doc. No. 73-1 at 9-10.  In the Motion, NASCAR does not seek to exclude Mr. Alvares's opinions regarding the syncrophaser system or the unidentified 12 or 14 gauge wire with beading.  Doc. No. 73.

In his report, Mr. Alvares reviews the chronology of the accident including the July 9, 2007 flight where the weather radar system failed.  Doc. No. 73-1 at 3.  Mr. Alvares reviews the National Transportation Safety Board's (the "NTSB") report and the Cessna Mishap Report for the July 9th and 10th flights.  *Id*. at 3-4.  Regarding his discussion of the weather radar system, Mr. Alvares states:

> The statements of [Mr. Tumicki] contain his observation and concerns regarding the electrical faulting of the weather radar system during his [July 9, 2007] flight. . . . There was no investigation as to the cause of the reported electrical faulting. Thus, there is no way to know what damage occurred to electrical components behind the instrument panel that were associated with the weather radar circuits.  Further, on Page 16 [of the NTSB] report [Mr. Tumicki] responding to a question from a board member as to how he would react to his discrepancy write-up: "If I saw that write-up, no I would not fly the airplane."
>
> The radio transmission[s on the July 10, 2007 flight] records a sequence of signal and transponder anomalies that may have been caused by a progressive deterioration of electrical systems.  These events started more than 4 minutes before the pilots declared the emergency. . . .
>
> In the Party Submission of NASCAR . . . to the NTSB . . . NASCAR states: "The probable cause of this incident was an

3

electrical fire which began within three to four minutes before the aircraft crash.  Evidence collected during the accident investigation shows that this fire ignited in electrical wiring which would have been installed behind the aircraft instrument panel by the aircraft manufacturer upon original manufacture of the aircraft in 1977."

On page 13 of the NTSB Summary report . . . the board members state . . .: "Given the previous day's events, the weather radar system and/or its associated wiring was most likely the source of the fire".  They further state: "the safety board could identify no other likely source of smoke or fire.  Although the weather radar system and/or its wiring is the most likely source of the fire, the safety board conclude that there was insufficient evidence to conclusively determine the origin of the in-flight fire."

There is a clear difference between the fire initiation scenario proposed by NASCAR and the scenario developed by the NTSB. . . . The rest of this report will review and weigh the – relied upon evidence and analysis – to see which scenario has more credence. . . .

The time delay between take-off and declaration of emergency by the pilots of [the Aircraft] on the day of the accident is consistent with the process involved where a hot junction causes pyrolysis and ultimately ignition of adjacent combustible materials.  It is also consistent with the experience of [Tumicki] on the day before the accident when rapid [de-]activation of radar circuit board stopped the electrical fault that caused the burning smell.

Doc. No. 73-1 at 4-6, 9 (internal emphasis omitted).[3]  Mr. Alvares then reviewed the report and

testing of one of NASCAR's experts, Dr. Merritt Birky, who opined that the in-flight fire

originated in either the syncrophaser system or the propeller de-ice circuits.  Doc. No. 73-1 at 6-

9.[4]

Regarding Dr. Birky's opinions on the weather radar system, Mr. Alvares states:

On page 7 . . . of Dr. Birky's expert report . . . he states: "The

---

[3] Pyrolysis is defined as "[c]hemical change caused by heat."  *See The American Heritage Dictionary*, Second College Edition (1985).

[4] Dr. Birky also opined that the unidentified 12 or 14 gauge wire was part of the propeller de-ice system.  Doc. No. 73-1 at 7.

failure of the weather radar system [on July 9, 2007] is most likely related to the short to ground of the 28 volt power wire to the propeller syncrophaser." If the – short to ground – of the 28 volt power wire to the propeller syncrophaser cause[d] failure of the weather radar system on [July 9, 2007], why did disengaging the weather radar circuit breaker terminate the electrical faulting that produced the burning smell? These are two separate circuits with dedicated circuit breakers so the syncrophaser fault should have continued [during the July 9, 2007 flight]. Conversely, electrical faulting associated with the weather radar system would have caused unknown and unresolved damage to unrelated circuits behind the instrument panel on the day before the accident. There is no way to define the extent of damage done, however the result of that damages is more likely than not, the root cause of the in-flight [fire] that brought down [the Aircraft].

Doc. No. 73-1 at 9. Therefore, because the smell of electrical components burning ceased after Tumicki de-energized the weather radar system's circuit breaker on July 9th, Mr. Alvares opines that the electrical failure the Aircraft experienced on July 9th and 10th originated in the weather radar system. *Id*.

## III.   ANALYSIS.

Federal Rule of Evidence 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) and *Daubert*, 509 U.S. 579, the Supreme Court held that the trial court must perform a "gatekeeper" function designed to ensure that any and all expert testimony is both relevant and reliable. "The burden of laying a proper foundation for the admissibility of an expert's testimony is on the party offering

the expert, and the admissibility must be shown by a preponderance of the evidence." *Hall v. United Ins. Co. of America*, 367 F.3d 1255, 1261 (11th Cir. 2004). The party offering the expert has "the burden to show that his expert [is] 'qualified to testify competently regarding the matters he intend[s] to address; [] the methodology by which the expert reache[d] his conclusions is sufficiently reliable; and [] the testimony assists the trier of fact.'" *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002) (quoting *Maiz v. Virani*, 253 F.3d 641, 664 (11th Cir. 2001)).

In *Daubert*, the Supreme Court identified the following non-exclusive list of factors a court should consider when determining the admissibility and reliability of expert testimony:

1) whether the expert's methods or techniques can be or have been tested;
2) whether the technique, method, or theory has been subject to peer review and publications;
3) whether the known or potential rate of error of the technique or theory when applied is acceptable; and
4) whether technique, method, or theory has been generally accepted in the scientific community.

509 U.S. 579, 594-95 (1993). In *Kumho Tire Co.*, the Supreme Court held that the *Daubert* factors applied not only to expert testimony based on scientific knowledge, but also to expert testimony based on general principles, technical knowledge, and other specialized knowledge. 526 U.S. 137, 141 (1999). Nonetheless, the trial court's "gatekeeping" function "'inherently require[s] the trial court to conduct an exacting analysis' of the *foundations* of expert opinions to ensure they meet the standards for admissibility under Rule 702." *U.S. v. Frazier,* 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *McCorvey*, 298 F.3d at 1257) (emphasis supplied). However, it is not the province of the trial court to make "ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Technology DC-8 v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). "Quite the contrary, '[v]igorous cross-examination,

6

presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Quiet Technology*, 32 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596).

For instance, if an analysis or study is based on inaccurate date, such flaws are more appropriate for cross-examination. *See Quiet Technology*, 326 F.3d 1333, 1345 (11th Cir. 2003) (citing *Daubert*, 509 U.S. at 596). "[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Quiet Technology*, 326 F.3d at 1345 (quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002)). According to the Supreme Court, the "failure to include variables will affect the analysis' probativeness [rather than] its admissibility." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986). Thus, "[s]o long as the expert's testimony rests upon 'good grounds,' it should be tested by the adversary process-competing expert testimony and active cross-examination-rather than excluded from jurors['] scrutiny for fear that they will not grasp its complexities or satisfactory [sic] weight its inadequacies." *Quiet Technology*, 326 F.3d at 1345 (internal citations and quotations omitted).

NASCAR argues that Mr. Alvares lacks sufficient facts to opine that the origin of the in-flight fire was most likely the weather radar system. Doc. No. 73 at 4-5. NASCAR asserts that Mr. Alvares's opinion is contingent on the assumption that one of the pilots on July 10th re-energized the circuit breaker for the weather radar system. *Id*. at 4. NASCAR maintains that because there is no direct evidence that occurred, that Mr. Alvares's opinions concerning the weather radar system lack sufficient factual support. *Id*. Cessna maintains that Mr. Alvares based his opinions on sufficient facts, including the NTSB's report, Tumicki's statements to the NTSB, his experience, industry literature on arc-beading and globules created by external heat,

7

the temporal relationship of the failure of the weather radar system on July 9th and the in-flight fire on July 10th, and, finally, an assumption that the weather radar system was re-energized on July 10th.  Doc. No. 95 at 9-13.[5]

In a products liability case under Florida law, a party may establish a prima facie case based upon circumstantial evidence.  *See Miller v. Allstate Ins. Co.*, 650 So.2d 671, 673-674 (Fla. 3d DCA 1995) (citing *Cassisi v. Maytag Co.*, 396 So.2d 1140, 1150-52 (Fla. 1st DCA 1981); *Lindsay v. McDonnell Douglas Aircraft Corp.*, 460 F.2d 621, 637-39 (8th Cir. 1972) (circumstantial evidence permissible to show cause of aircraft accident where airplane was destroyed and "circumstantial evidence is about the only evidence available.")).   In this case, due to the accident, destruction of the circuit breaker for the weather radar system, and the death of the pilots, there is no direct evidence available as to whether one of the pilots re-energized the weather radar system on July 10th.  Thus, Cessna must proceed with circumstantial evidence.

In *McLean v. 988011 Ontario, LTD.*, 224 F.3d 797, 799-806 (6th Cir. 2000), a negligence action arising out of three deaths from an airplane accident where the airplane broke apart in-flight, the plaintiff maintained the cause of the crash was negligent servicing of the aircraft and the defendants argued it was pilot error.  *Id.*   Just prior to the crash, one of the defendants, doing business as Plane Perfection, refurbished the plane, which included removal of the rudder and installation of new stabilator tips.  *Id.* at 799, 801.   Reinstallation of the rudder and stabilator required balancing them.  *Id.* at 801.  A critical issue was whether the rudder horn balance weight came off.  *Id.* at 803.  The NTSB report indicated a tail tip fairing had come off.  *Id.* One of the

---

[5]  There is evidence indicating that the pilot's pre-flight procedure checklist before taxi requires resetting or energizing all circuit breakers unless they have been collared or placarded inoperable.  *See* Docs. No. 72-1 at 7, 18; 72-3 at 59 ("The check list for before tax says, check all the circuit breakers.  Check them to be in."). It has also been theorized that the pilots for the July 10th flight may not have done so because they were previously alerted to the inoperable status of the weather radar system and because the weather radar was not necessary for the flight on July 10th. Doc. Nos. 99-20 at 14.

plaintiff's experts opined that the balance stabilator was the root cause of the crash, in part, based on his observations about where parts of the plane were found at the crash site.   The expert testified that the horn balance weight came off and that the NTSB report incorrectly identified that part as the tail tip fairing.   Defendants argued plaintiff's expert had incorrectly assumed critical facts without support, i.e., that the part at issue was incorrectly described in the NTSB report, and therefore, its location at the crash site.   *Id*. at 803-04.[6]

The District Court granted defendants' motion for summary judgment, holding that the plaintiff's expert witnesses' opinions contradicted each other, impermissibly relied upon circumstantial evidence that was undermined by other evidence, and offered no more plausible explanation than that of the defendants.   *Id*. at 799.   The Sixth Circuit reversed, stating that:

> Circumstantial evidence in a products liability case should "fairly indicate 'a logical sequence of cause and effect'...." The [plaintiff] contend[s] that though the experts differed on where the problem originated, both presented a logical sequence of cause and effect between Plane Perfection's negligence and the aerodynamic instability known as flutter that each concludes caused the crash. "[A]n expert's opinion must be supported by 'more than subjective belief and unsupported speculation' and should be supported by 'good grounds,' based on what is known." *Pomella v. Regency Coach Lines, Ltd*., 899 F.Supp. 335, 342 (E.D.Mich.1995), quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The expert's conclusions regarding causation must have a basis in established fact and cannot be premised on mere suppositions. <u>An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record.</u> *See Shaw v. Strackhouse*, 920 F.2d 1135, 1142 (3d Cir.1990). <u>However, mere "weaknesses in the factual basis of an expert witness' opinion ... bear on the weight of the evidence rather than on its admissibility</u>." *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir.1993).

*McLean*, 224 F.3d at 800-801 (emphasis added and some internal citations omitted).   In *McLean*, one of the plaintiff's experts admitted he could not rule out the possibility that improper

---

[6] There was argument that the NTSB's investigator's primary expertise was in helicopters.  *Id*. at 803.

tensioning of the control cables may have been the sole cause of the crash.  *Id*. at 802.  Another

of plaintiff's experts testified that he had no idea what actually happened to the aircraft's rudder

horn balance weight during service or during the flight, but because of the facts known he opined

that the unit no longer functioned properly.  *Id*. at 803-804.  That expert further testified that for

the rudder horn balance weight to have failed:

> "[Y]ou would have to have exceeded 36 g's on this assembly ...
> And I think that's not a logical expectation except from a
> standpoint of a flutter instability ... So the failure of this joint has to
> be consistent with an improper installation of either a part that's
> been damaged or the way it was installed or the combination of
> both, and so that's the only way I believe that could possibly have
> failed."

*Id*. at 804.  The Sixth Circuit described the testimony and its implications as follows:

> Thus, <u>if the rudder horn balance weight separated</u>, either a bad part
> or an improperly installed part caused the problem, either way
> Plane Perfection is culpable.  <u>If, as the NTSB report suggests, the
> rudder horn balance weight did not separate</u>, that does not disprove
> [the expert's] theory that flutter caused the plane to crash.
> Although that fact would discredit [the expert's] primary theory . .
> ., he pointed to ample unrelated evidence . . . that makes the
> remainder of his testimony far from speculative.

*Id*. (emphasis added). Ultimately, although the experts' opinions were based in part upon certain

assumptions and circumstantial evidence, the Sixth Circuit held that the plaintiff has "presented a

plausible theory, supported by what evidence is available, which if believed by the jury could

establish negligence. . . ."  *Id*. at 805.

    In *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662-63 (11th Cir. 1988), the Eleventh Circuit

stated:

> [A]bsolute certainty is not required.   Expert testimony is
> admissible which connects conditions existing later to those
> existing earlier provided the connection is concluded logically.
> Whether this logical basis has been established is within the

> discretion of the trial judge and the weaknesses in the
> underpinnings of the expert's opinion go to its weight rather than
> its admissibility.  On cross-examination, the opposing counsel is
> given the opportunity to ferret out the opinion's weaknesses to
> ensure the jury properly evaluates the testimony's weight and
> credibility.

*Id*. (internal citations omitted). In this case, it is recommended that the Court find that Mr. Alvares's opinions regarding the weather radar system are based upon sufficient facts – although based upon circumstantial evidence and an assumption that one of the pilot's re-energized the weather radar circuit – that logically connect the in-flight fire on July 10th with the failure of the weather radar system on July 9th.

NASCAR argues that Mr. Alvares's opinions should also be excluded because they are not based on reliable scientific principles and methods.  Doc. No. 73 at 5-6.  NASCAR asserts that Mr. Alvares's opinions are based solely on the temporal relationship between the events on July 9th and the crash on July 10th, which is the *post hoc ergo propter hoc* fallacy, and should be excluded. Doc. No. 73 at 5-6.[7]  Cessna maintains that Mr. Alvares did not base his opinions solely on the close temporal relationship between the two events and he did not merely opine causation from the two events due to their close proximity.  Doc. No. 95 at 10-13.  Rather, Cessna contends that Mr. Alvares adequately explained specific reasons why the close temporal relationship between the two events leads to the conclusion that the in-flight fire on July 10th most likely began with pyrolysis in the weather radar system on July 9th.  *Id*. at 11-13.

This is not a situation where Mr. Alvares is simply saying that because the weather radar system failed on July 9th, it must have caused the in-flight fire on July 10th.  Mr. Alvares based

---

[7] The Eleventh Circuit has stated: "The *post hoc ergo propter hoc* fallacy assumes causality from temporal sequence.  It literally mean 'after this, because of this.'  It is called a fallacy because it makes an assumption based on the false inference that a temporal relationship proves a causal relationship." *McClain v. Metabolife Intern., Inc*. 401 F.3d 1233, 1243 (11th Cir. 2005) (internal citations omitted).

his opinions on the NTSB report, Mr. Tumicki's statements, industry literature, his experience, photographs of component parts of the Aircraft, and the parties' post-crash submissions to the NTSB.  Doc. No. 73-1 at 12.   Mr. Alvares also explained that the rapid escalation of the fire on July 10th is consistent with pyrolysis occurring on July 9th.  Doc. No. 73-1 at 8-9.  Accordingly, it is recommended that the Court find Mr. Alvares's opinions are based on reliable scientific methods and techniques.

IV.    **CONCLUSION**.

Based upon the forgoing, it is **RECOMMENDED** that the Court **DENY** the Motion (Doc. No. 73).

Failure to file written objections to the proposed findings and recommendations contained in this report **on or before Tuesday, March 15, 2011** shall bar an aggrieved party from attacking the factual findings on appeal.

**Recommended** in Orlando, Florida on March 8, 2011.


_____
GREGORY J. KELLY
UNITED STATES MAGISTRATE JUDGE

Copies to:
Presiding District Judge
Counsel of record
Unrepresented parties