## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
#### ORLANDO DIVISION

**COMPETITOR LIAISON BUREAU, INC.,**
**NASCAR, INC.,**

        **Plaintiffs,**

-vs-                                            **Case No. 6:08-cv-2165-Orl-28GJK**

**CESSNA AIRCRAFT COMPANY,**

        **Defendant.**

_____/

### REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

    This cause came on for consideration without oral argument on the following motion:

| | |
|---|---|
| **MOTION:** | **PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE PORTIONS OF THE TESTIMONY OF EXPERT WITNESS TOMMY MCFALL (Doc. No. 72)** |
| **FILED:** | **November 17, 2010** |

**THEREON** it is **RECOMMENDED** that the motion be **DENIED**.

## I.    BACKGROUND.

    Because the relevant background facts and definitions are largely set forth in the Court's prior Report and Recommendation, the Court incorporates the background facts contained in Docket Entry No. 121. This Report and Recommendation concerns NASCAR's Motion In Limine to Exclude Portions of the Testimony of Expert Witness Tommy McFall (the "Motion"),

1

an expert in aviation accident investigation and reconstruction. Doc. No. 72. Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), NASCAR seeks to exclude Mr. McFall's opinions concerning the weather radar system because he lacks expertise in metallurgical engineering, fire cause and origin, toxicology, and aircraft maintenance. Doc. No. 72 at 4-7. NASCAR maintains that Mr. McFall's opinions concerning the weather radar antenna lack sufficient facts because they simply repeat the opinions of Dr. Claxton, Cessna's metallurgical engineering expert. Doc. No. 72 at 8. NASCAR also argues that Mr. McFall's opinions should be excluded because they rely on an unsupportable assumption that one of the pilots re-energized the weather radar circuit breaker. Doc. No. 72 at 8-9.

## II.    <u>THE REPORT.</u>

Mr. McFall is an expert in aircraft accident investigation and reconstruction. Doc. Nos. 72-1 at 24; 72-2 at 5. Mr. McFall's curriculum vitae provides:

> [He] has over 30 years of operational and investigative experience in commercial, military, corporate, and general aviation. He is available to consult on a variety of aviation topics in commercial or general aviation including accident investigation, development/assessment of proactive safety programs, safety auditing, and emergency response planning. His background offers a unique balance of accident investigation work on behalf of the military, an airline, and as an [National Transportation Safety Board] investigator.

Doc. No. 72-1 at 24. Mr. McFall worked as an investigator and regional director for the National Transportation Safety Board (the "NTSB") from 1983 through 1995. Doc. No. 72-1 at 25. As part of his duties with the NTSB, Mr. McFall taught aviation accident investigation courses. *Id.* Since April of 2003, Mr. McFall has also worked as an airline operational safety auditor. Doc. No. 72-1 at 24. Mr. McFall also holds airman certificates as an airline transport pilot, a "flight engineer turbojet," and as a certified flight instructor. Doc. No. 72-1 at 25. Mr. McFall is an

2

experienced pilot.  Doc. No. 72-2 at 62.

During his deposition, Mr. McFall testified that when retained as an expert he considers "anything to do with what led up to the accident, the actual sequence of events of how the aircraft struck the ground, background of what led up to the accident, sequence of events that led to the accident[, and] [p]retty much any issue that's related to the accident."  Doc. No. 72-2 at 6. Mr. McFall has testified both at depositions and trials as an expert in aviation accident reconstruction.  Doc. No. 72-1 at 21-23.

In his report, Mr. McFall reviews: the chronology of the accident, including the July 9, 2007 flight where the weather radar system failed; the certifications of the July 10th pilots, Dr. Kennedy and Mr. Klemm; the autopsy reports for both pilots; the Aircraft's Operating Handbook; NASCAR's maintenance process, including its standard operating procedures manual; the events that took place after the July 9th flight landed and the take-off of the July 10th flight; industry-accepted methods of collaring and placarding inoperative equipment on an airplane; the Federal Aviation Administration's (the "FAA") Handbook of Aeronautical Knowledge; pertinent Federal Aviation Regulations ("FARs"); the deactivation of the Aircraft's weather radar system on July 9th; Norman Alvares's expert opinions regarding the cause and origin of the in-flight fire; Dr. Raymond J. Claxton's expert opinions regarding the propeller syncrophaser system; and NASCAR's alleged non-compliance with its standard operating procedures manual.  Doc. No. 72-1 at 2-17.  After conducting the review set forth above, Mr. McFall offers the following opinions:

>  1. Other than the open maintenance item from the last flight, the investigation did not reveal any malfunctions or defects in the accident airplane;
>
>  2. The hand held fire extinguisher was not found in the wreckage;

therefore, other than NASCAR officials so stating to the NTSB, there was no evidence that it was onboard the airplane;

3. The lack of soot in either pilot's larynx and thyroid is not consistent with an intense smoke-producing cabin fire;

4. The pilots failed to comply with a "caution" in the In-flight Cabin Fire or Smoke Emergency Procedures to not open the cabin door;

5. The director of maintenance['s] procedures [for] respond[ing] to aircraft discrepancies was inadequate and resulted in releasing the accident airplane for flight with an open maintenance item, which ultimately led to the in-flight fire.

6. The director of maintenance['s] procedures to document aircraft discrepancies and corrective action was inadequate and resulted in no maintenance reaction to the previous flight's discrepancy and loss of the maintenance department's copy of the discrepancy sheet;

7. NASCAR's [standard operating procedures manual] was not updated or implemented;

8. NASCAR was in violation of FAR 91.213(d), 91.405, 43.9, and 43.11;

9. Mr. Brendle exhibited his lack of understanding of maintenance requirements by suggesting that the maintenance discrepancy sheet left in the airplane would serve as a placard;

10. Mr. Tumicki's description of the "smell of electrical component burning" should have alerted NASCAR of the potential for in-flight fire if the discrepancy was not corrected or properly deferred;

11. Despite the lack of paperwork, the director of maintenance and the chief pilot were fully aware of the discrepancy but failed to ensure the problem was either corrected or properly deferred;

12. Mr. Tumicki assumed the discrepancy would be corrected prior to the next flight;

13. The conversations about collaring the radar circuit breaker between Mr. Solis, and the directors of maintenance and aviation indicate an awareness of the importance of preventing the radar circuit

4

breaker from being reset;

14. There is no evidence that Dr. Kennedy, [the pilot] who occupied the left seat, was aware of the discrepancy written-up by Mr. Tumicki;

15. It is not clear that Mr. Klemm[, the other pilot], was informed of the "smell of electrical component burning";

16. It is more likely than not that Dr. Kennedy reset the radar circuit breaker during his accomplishment of the Before Taxi Checklist;

17. The recovered syncrophaser wire harness and attached plug did not offer evidence of fire initiation.  Melting observed on the wires associated with the syncrophaser connector resulted from the post impact fire;

18. The in-flight fire was caused by an electrical fault associated with the weather radar, as evidenced by the unresolved maintenance discrepancy from the previous flight.  The intermittent loss of transponder and radio about half way into the accident flight was most likely an early symptom of the malfunction;

19. The cause of this accident was not related to any defective or improperly installed wiring on the [Aircraft]; and

20. The cause of this accident was improper maintenance practices within the NASCAR Flight Department that resulted in release of the accident airplane without corrective action regarding the previous flight's maintenance discrepancy.  Factors were:
    ▪ The resultant in-flight fire;
    ▪ The accident pilot accepting the airplane without maintenance corrective action;
    ▪ The malfunctioning radar unit;
    ▪ NASCAR's failure to properly deactivate and placard the radar unit;
    ▪ NASCAR's failure to update and implement their internal SOP;
    ▪ The pilots' failure to follow the emergency checklist by opening the cabin door, which more likely than not worsened the fire.

Doc. No. 72-1 at 18-19.  Thus, Mr. McFall offers opinions regarding a wide range of issues

regarding the Aircraft accident, and Mr. McFall also adopts the conclusions of two of Cessna's

other experts – Dr. Claxton and Mr. Alvares.  Doc. No. 72-1.

## III.    ANALYSIS.

Federal Rule of Evidence 702 states:

> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form
> of an opinion or otherwise if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.  In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) and *Daubert*, 509

U.S. 579, the Supreme Court held that the trial court must perform a "gatekeeper" function

designed to ensure that any and all expert testimony is both relevant and reliable.  "The burden of

laying a proper foundation for the admissibility of an expert's testimony is on the party offering

the expert, and the admissibility must be shown by a preponderance of the evidence."  *Hall v.

United Ins. Co. of America*, 367 F.3d 1255, 1261 (11th Cir. 2004).  The party offering the expert

has "the burden to show that his expert [is] 'qualified to testify competently regarding the

matters he intend[s] to address; [] the methodology by which the expert reache[d] his conclusions

is sufficiently reliable; and [] the testimony assists the trier of fact.'"  *McCorvey v. Baxter

Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002) (quoting *Maiz v. Virani*, 253 F.3d 641,

664 (11th Cir. 2001)).

In *Daubert*, the Supreme Court identified the following non-exclusive list of factors a

court should consider when determining the admissibility and reliability of expert testimony:

1) whether the expert's methods or techniques can be or have been tested;
2) whether the technique, method, or theory has been subject to peer review and
   publications;

    3)  whether the known or potential rate of error of the technique or theory when applied is acceptable; and

    4)  whether technique, method, or theory has been generally accepted in the scientific community.

509 U.S. 579, 594-95 (1993). In *Kumho Tire Co.*, the Supreme Court held that the *Daubert* factors applied not only to expert testimony based on scientific knowledge, but also to expert testimony based on general principles, technical knowledge, and other specialized knowledge. 526 U.S. 137, 141 (1999). Nonetheless, the trial court's "gatekeeping" function "'inherently require[s] the trial court to conduct an exacting analysis' of the *foundations* of expert opinions to ensure they meet the standards for admissibility under Rule 702." *U.S. v. Frazier,* 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *McCorvey*, 298 F.3d at 1257) (emphasis supplied). However, it is not the province of the trial court to make "ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Technology DC-8 v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). "Quite the contrary, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Quiet Technology*, 32 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596).

For instance, if an analysis or study is based on inaccurate date, such flaws are more appropriate for cross-examination. *See Quiet Technology*, 326 F.3d 1333, 1345 (11th Cir. 2003) (citing *Daubert*, 509 U.S. at 596). "[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Quiet Technology*, 326 F.3d at 1345 (quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002)). According to the Supreme Court, the "failure to include variables will affect the analysis' probativeness [rather than] its admissibility." *Bazemore v.*

7

*Friday*, 478 U.S. 385, 400 (1986).  Thus, "[s]o long as the expert's testimony rests upon 'good grounds,' it should be tested by the adversary process-competing expert testimony and active cross-examination-rather than excluded from jurors['] scrutiny for fear that they will not grasp its complexities or satisfactory [sic] weight its inadequacies."  *Quiet Technology*, 326 F.3d at 1345 (internal citations and quotations omitted).  Moreover, "[e]xperts routinely rely on the work of others, a practice permitted by Fed.R.Evid. 703, so long as the facts or data on which they rely is of the type reasonably relied on by experts in the relevant field."  *City of St. Petersburg v. Total Containment, Inc.*, 2009 WL 3335013 at *4 (S.D. Fla. 2009) (citing *CBS, Inc. v. PrimeTime 24 Joint Venture*, 9 F.Supp.2d 1333, 1342 (S.D. Fla. 1998)).

    A.  Expertise.

    NASCAR argues that Mr. McFall lacks the expertise necessary to offer opinions regarding metallurgical engineering, fire cause and origin, toxicology, and aircraft maintenance issues.  Doc. No. 72 at 2, 4-7.

    1.  Metallurgical Engineering and Fire Cause and Origin.

    Regarding metallurgical engineering and fire cause and origin, Mr. McFall opined that:

> The recovered syncrophaser wire harness and attached plug did not offer evidence of fire initiation.  Melting observed on the wires associated with the syncrophaser connector resulted from the post impact fire.

> The in-flight fire was caused by an electrical fault associated with the weather radar, as evidenced by the unresolved maintenance discrepancy from the previous flight.  The intermittent loss of transponder and radio about half way into the accident flight was most likely an early symptom of the malfunction.

Doc. No. 72-1 at 18.  In his report under the headings "Fire and Origin" and "Engineering Analysis," Mr. McFall quotes from and adopts the conclusions of Dr. Claxton, a metallurgical

8

engineer, and Mr. Alvares, a fire cause and origin expert.  Doc. No. 72-1 at 15-16.[1]  In his

deposition, Mr. McFall stated:

> I wouldn't have the technical knowledge without someone like
> [Dr.] Claxton or Mr. Alvares - - or at least [Dr.] Claxton to do the
> sort of analysis that he did [of the propeller syncrophaser system
> and weather radar system].  I can listen to him tell me what he's
> found and I can make my own conclusions about how it fits in the
> big picture of the accident, but as far as picking it up and making
> his conclusions about various temperatures and what reacts at what
> temperature and what symptoms you would see, I don't have that
> expertise.

Doc. No. 72-3 at 18.  As set forth above, it is permissible for an expert to rely on the reports and

opinions of other experts, so long as the facts or data upon which they rely is of the type which

would be reasonably relied upon by an expert in that relevant field. *City of St. Petersburg,* 2009

WL 3335013 at *4 (S.D. Fla. 2009).  An aviation accident investigator, or expert in accident

reconstruction, would reasonably rely on such reports, facts, and conclusions.  *See generally,*

*Crowe v. Maryland*, 506 F.3d 13, 17-18. (1st Cir. 2007) (expert's reliance on X-ray and MRI

reports prepared by others, instead of reading the films himself, fulfilled Rule 702's sufficient

facts or data requirement).  Accordingly, it is recommended that the Court find Mr. McFall

permissibly relied upon the reports, data, and conclusions of Dr. Claxton and Mr. Alvares.

    2.  Toxicology.

    NASCAR maintains that Mr. McFall lacks the expertise to opine that "the lack of soot in

either pilot's larynx and thyroid is not consistent with an intense smoke-producing cabin fire."

Doc. Nos. 72 at 5-6; 72-1 at 18.  Mr. McFall reviewed the pilot's autopsy results as part of his

report.  Doc. No. 72-1 at 20. During his deposition, Mr. McFall testified that based upon his

experience as aviation accident investigator, when individuals have been exposed to smoke, they

---

[1] The undersigned has previously recommended that the Court find the opinions of Dr. Claxton and Mr. Alvares are
based on sufficient facts, reliable scientific principles, and would be helpful to the jury.  *See* Doc. Nos. 121, 123.

will have soot in their larynx and thyroid because "[i]t's not unusual at all in an environment, in accidents like this of in-flight fire to find – to read in autopsies that there was that sort of thing found in people internally."  Doc. No. 72-2 at 33-34. Mr. McFall further stated that "[t]he lack of soot would imply that the pilots did not inhale a great deal of smoke."  *Id*. at 34.  Although Mr. McFall is not an expert in toxicology, as an aviation accident investigator, it is recommended that the Court find that it was reasonable for him to review the autopsy reports and to rely on the absence of soot in the pilot's larynx when offering opinions on whether there was, or likely was "an intense smoke-producing cabin fire."  Doc. No. 72-1 at 18.

3.  Maintenance Issues.

NASCAR maintains that because Mr. McFall is not a licensed aircraft mechanic he does not have the requisite expertise to provide expert testimony regarding maintenance issues. Doc. No. 72 at 6-7.[2]  Cessna maintains that Mr. McFall has offered no opinions which would require him to have aircraft mechanic's license.  Doc. No. 93 at 13-14.  Cessna asserts that Mr. McFall possesses the knowledge, skill, experience, training, and education to testify as to whether NASCAR's maintenance department properly implemented its standard operating procedures manual regarding the Tumicki operational discrepancy report.  Doc. No. 93 at 13-19.[3]

During Mr. McFall's deposition, he testified based upon his experience NASCAR's maintenance department failed to properly collar and placard the weather radar system as inoperable.  Doc. No. 72-2 at 45-52.  Mr. McFall also criticized NASCAR's maintenance department for failing to follow-up on Mr. Tumicki's discrepancy report and Mr. Klemm for

---

[2] NASCAR does not cite to any case law supporting its position that a trained aviation crash investigator lacks the necessary expertise to offer testimony regarding whether a party properly followed its standard operating procedures for handling operational discrepancy issue.  Doc. No. 72 at 6-7.

[3] Cessna also does not cite to any case law supporting its position.  Doc. No. 93 at 13-14.

10

accepting the aircraft without corrective action being taken on the Tumicki discrepancy report.

*Id*. at 52-56.  Mr. McFall stated:

> As a pilot, if I have evidence that there's been some sort of combustion that's caused me to be able to smell it, I want to know what secondary damage has been caused.  I'm not just going to focus my concern on the radar.  If I know, as a pilot, that there's been something burning or arching or whatever in an airplane, I'm concerned not only about that component, I'm concerned about secondary damage that may have been caused to other components, for which I haven't seen a symptom yet.  My mind, as a pilot, any prudent pilot who has evidence there's something burning in an airplane wouldn't fly the airplane until they've figured out, one, what was burning, and two, what secondary damage could have occurred as a result of the burning.  We can't just focus on the radar and only the radar.  You have to focus on the burning, the fact that nobody knows what it was, nobody ever made an effort to see what it was.  And therefore, just having that circuit breaker pulled [to the weather radar], especially when it's not powered, is insufficient.

Doc. No. 72-2 at 57-58.  As an aviation accident investigator, expert in accident reconstruction, and as an experienced pilot, it is recommended that the Court find Mr. McFall has the necessary expertise to offer the opinions contained in his report relating to maintenance issues.

   B.  Sufficient Facts.

   NASCAR maintains that Mr. McFall's opinions concerning the weather radar system as the cause of the in-flight fire and crash are not supported by sufficient facts because they are based solely on the speculative assumption that Dr. Kennedy re-energized the weather radar circuit breaker on July 10th.  Doc. No 72 at 9.  NASCAR asserts that there is no direct evidence that occurred, and Mr. McFall's opinions should be excluded.  *Id*.  Cessna contends that "Mr. McFall appropriately relied on . . . direct and circumstantial evidence of the previous days [sic] involving 'burning' associated with the . . . weather radar and the remaining sequence of events

leading to the next days [sic] fatal burning event and reached a logical conclusion based on his

years of accident investigation and reconstruction experience." Doc. No. 93 at 15.

During his deposition, the following exchanges occurred:

Q.   You say in your report that it is more likely than not that Dr. Kennedy [re-energized] the radar circuit breaker during his accomplishment of the before taxi checklist. . . . What evidence do you have that Dr. Kennedy or really anybody [re-energized] the radar circuit breaker?

A.   Dr. Kennedy's the only person who would be in a position, physically, to [re-energize] it in flight, because it's not reachable from the right seat.  The evidence indicates that the radar was the source of the smoke and that - - so, therefore, the circuit breaker had to be reset, assuming that it was pulled by Mr. Tumicki [on July 9th], which I assume he did.  The radar circuit breaker had to be reset before the fire or the smoke reappear.

Q.   That's assuming that the weather radar system was the source of the smoke, correct?

A.   That's going by all the evidence that indicates that the weather radar was the source of the smoke.

Q.   Do you have any physical evidence that either pilot pushed in the - - or reinserted the circuit breaker?

A.   I think we have physical evidence that either the circuit breaker was never pulled or it was reset.

Q.   Your physical evidence is, again, your assumption that the weather radar system caused the smoke?

A.   It's not an assumption. . . . We have evidence that the smoke would not have been caused by - - we don't have any evidence that it was anything else, and we have evidence that it was the radar.

Q.   Anything besides that?

A.   . . . We have evidence from the radar antenna, and we have evidence from the syncrophaser wiring that indicates that

the syncrophaser was not part of the in flight fire and that the radar antenna was.

Q.    Any other evidence?

A.    Mr. Tumicki's experience from the day before.

Q.    How is that evidence that the circuit breaker was put back in?

A.    Mr. Tumicki's evidence - - Mr. Tumicki's experience from the day before is certainly evidence that there was a malfunction of the radar system someplace that caused a smelling of burning.   The fact that there was no [maintenance] performed between Mr. Tumicki's flight on the 9th and the accident flight of the 10th means nothing changed.  We had - - apparently, the same thing happened, because very shortly after the flight began, they declare an emergency.  So, to isolate those two events is certainly not likely to be safe to do.  Meaning, it's unsafe to assume that those two events aren't related.

Doc. No. 72-2 at 58-61.  Later in the deposition, the following exchanges occurred:

Q.    What is the basis of your belief that [Dr.] Kennedy was unaware of the problem [with the weather radar], such that he pushed the circuit breaker back in before the flight?

A.    The check list for before taxi says, check all the circuit breakers.  Check them to be in.  So he's going to be told by a check list, and he's been told by training that all the circuit breakers should be in unless they're collared.  And if it's collared, there's going to be a reason for it.  One would then look at the maintenance discrepancy sheet in this case. All the evidence indicates that the in flight event that caused the emergency to be declared is the same event that caused Mr. Tumicki to make his maintenance write-up and pull the circuit breaker the day before. . . .  All the evidence indicates that the in flight event began with the radar. Assuming that the circuit breaker was still pulled when they began the accident flight, someone had to reset it. [Dr.] Kennedy is the only person who was in a position to do that.  There's no evidence that [Dr.] Kennedy was ever told about the discrepancy written up by Mr. Tumicki.

13

> There's no evidence that Mr. Klemm was fully told about
> Mr. Tumicki's event.  That's the answer to my question.

Doc. No. 72-3 at 59-60.  Thus, Mr. McFall testified that the basis for his assumption that Dr. Kennedy re-energized the weather radar's circuit breaker are the events leading up to the July 10th flight, the opinion that the weather radar system caused the in-flight fire on July 10th, and the pre-taxi checklist that Dr. Kennedy was required to follow, which included re-energizing all circuit breakers. Doc. Nos. 72-2 at 58-61; 72-3 at 59-60.  In this Court's prior Report and Recommendation concerning Mr. Alvares's expert testimony (Doc. No. 123), the Court described how in a case such as this it is appropriate for an expert to rely, in part, on circumstantial evidence and assumptions if the ultimate opinion upon which they are based logically connects conditions existing later to those existing earlier.  *Id*. at 8-11 (citing and quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662-63 (11th Cir. 1988); *McLean v. 988011 Ontario, LTD.*, 224 F.3d 797, 799-806 (6th Cir. 2000)).  Based upon the legal analysis set forth therein and the testimony of Mr. McFall quoted above, it is recommended that the Court find that Mr. McFall's opinions concerning the weather radar system are based upon sufficient facts that logically connect the in-flight fire on July 10th with the failure of the weather radar system on July 9th.

## IV.   <u>CONCLUSION</u>.

Based upon the forgoing, it is **RECOMMENDED** that the Court **DENY** the Motion (Doc. No. 72).

Failure to file written objections to the proposed findings and recommendations contained in this report **on or before Wednesday, March 16, 2011** shall bar an aggrieved party from attacking the factual findings on appeal.

**Recommended** in Orlando, Florida on March 9, 2011.


_____
GREGORY J. KELLY
UNITED STATES MAGISTRATE JUDGE

Copies to:
Presiding District Judge
Counsel of record
Unrepresented parties