# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**COMPETITOR LIAISON BUREAU, INC.,**
**NASCAR, INC.,**

        **Plaintiffs,**

**-vs-**                                                           **Case No.  6:08-cv-2165-Orl-28GJK**

**CESSNA AIRCRAFT COMPANY,**

        **Defendant.**

_____/

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

        This cause came on for consideration without oral argument on the following motion:

| | |
|---|---|
| **MOTION:** | **DEFENDANT'S MOTION TO PRECLUDE CERTAIN TESTIMONY OF PLAINTIFFS' EXPERTS   (Doc. No. 81)** |
| **FILED:** | **November 24, 2010** |
| | |
| **THEREON** it is **RECOMMENDED** that the motion be **GRANTED in part and DENIED in part**. | |

## I.    BACKGROUND.

        Because the relevant background facts and definitions are largely set forth in the Court's

prior Report and Recommendation, the Court incorporates the background facts contained in

Docket Entry No. 121 to the extent not inconsistent with those set forth herein.  This Report and

Recommendation concerns Cessna's Motion to Preclude Certain Testimony of Plaintiffs' Experts

(the "Motion").  Doc. No. 81.  Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Cessna maintains that five of NASCAR's experts should be excluded from offering any opinion, report, or testimony that the pilots of the July 10, 2007 flight were incapacitated due to inhalation of large quantities of hydrochloric acid gas ("HCl") released as a byproduct of burning PVC wire insulation attached to the propeller syncrophaser harness, which caused the crash (the "Causation Opinion").  Doc. No. 81 at 2-13, 16, 21-24.

First, Cessna asserts that NASCAR's experts lack the necessary expertise to offer the opinion that HCl incapacitated the pilots during the July 10th flight.  Doc. No. 81 a 2, 4-13, 16.  Second, Cessna contends that the experts' Causation Opinion is unreliable because it is based upon improper methodology, pyramiding of inferences, and extrapolation of evidence.  Doc. No. 81 at 3-4, 16-21.  Third, Cessna argues that the testimony would not be helpful to the jury because it is too speculative and proposes too great an analytical leap between the facts and the experts' Causation Opinion.  Doc. No. 81 at 4, 21-23.  Finally, pursuant to Rule 403, Federal Rules of Evidence, Cessna maintains that the Causation Opinion should be excluded because it is unduly prejudicial and would likely mislead the jury.  Doc. No. 81 at 4, 23-24.

## II.   THE REPORTS.

### A.  Merritt M. Birky, Ph.D.

Dr. Birky received a doctorate degree in chemistry in 1962.  Doc. Nos. 99-14 at 3; 99-16 at 2.  Between 1964 and 1982, Dr. Birky conducted fire research at the National Bureau of Standards, and developed a fire analytical and smoke toxicology laboratory.  Doc. No. 99-16 at 2.  The toxicology portion of the laboratory consisted of controlled exposure of rats to smoke from small and large scale fires.  *Id.*  From 1983 through 2000, Dr. Birky worked at the National Transportation Safety Board (the "NTSB") as a fire investigator and toxicologist.  *Id.*  "During

this time, [he] developed testing protocol[s] for drugs, alcohol, and post mortem toxicology analysis on the fatally injured operators of commercial transportation vehicles." *Id*. Dr. Birky has previously testified as expert. Doc. No. 99-16 at 2.

On November 29, 2007, Dr. Birky was retained by NASCAR to: 1) determine fire origin; 2) determine the amount of smoke from PVC wire insulation required to cause impairment; and 3) determine whether the pilots were incapacitated, causing the crash. Doc. No. 99-16 at 4. Dr. Birky opines that the in-flight fire originated in either the propeller syncrophaser system or the propeller de-ice system, but it is more likely than not that the fire began in the propeller syncrophaser system. Doc. No. 99-16 at 8.[1] Dr. Birky's findings and conclusions are set forth below:

> The following findings are based on my review of the materials . . ., study of wreckage materials, my 15 years studying the effects of smoke on humans and animals, and 20 years of accident investigations.
>
> 1. The origin of the in-flight fire was confirmed from wreckage examination that was not involved in the post crash fire to have occurred behind the instrument panel;
>
> 2. The wire insulation installed in the airplane at the time of manufacture was a polyvinyl chloride [PVC] covered with nylon;
>
> 3. The electrical problem with the weather radar was a symptom of an electrical problem and not the cause of the in-flight fire;
>
> 4. The plug with the beaded wires was identified as the propeller syncrophaser circuit;
>
> 5. Records show that the syncrophaser circuit was an installed option when the airplane was manufactured;
>
> 6. The 28 volt wire on the propeller syncrophaser wire harness taken

---

[1] Cessna maintains that the wire Dr. Birky identified as being part of the propeller de-ice system may not even be an aircraft wire, but may be a wire from an appliance in one of the homes involved in the crash. *See generally* Doc. No. 73-1 at 9-10.

3

from an exemplar airplane was frayed through the nylon and into the PVC insulation at about 9 inches from the 26 pin electrical plug;

7. The 14 gauge wire fragment with the bead [may] have come from the propeller de-ice system;

8. The initial combustible material in this area is PVC electrical wire insulation;

9. PVC has a very low temperature rating of 105 [degrees Celsius];

10. PVC wire insulation decomposes at relative low temperatures and starts to release hydrochloric acid as low as 200 [degrees Celsius];

11. The smoke from burning PVC wire insulation contains potent irritants including hydrochloric acid;

12. Calculations show that it would take about 2.3 feet of PVC decomposition to cause crew incapacitation;

13. The airplane was not configured for landing (gear and flaps were up and speed was too high);

14. The crew members did not die from inhalation of toxic products from the smoke;

15. Because of the short smoke exposure duration of the cockpit crew from the PVC degradation the amount of carbon monoxide will be very low (less than 10%);

16. Because of the short exposure to smoke from PVC followed by immediate death there will not be sufficient time to develop edema of the respiratory tract;

17. Because of the low decomposition temperature of PVC, hydrochloric acid (HCl) will be released at low temperatures and cause sensory and pulmonary irritation; and

18. Exposure to smoke (HCl) from the PVC incapacitated the cockpit crew resulting in loss of control of the airplane.

From the above review of PVC smoke toxicity, facts obtained from the accident hardware, other documents and photos reviewed, and my 35 plus years in fire toxicology and accident investigations, I

4

<u>conclude with a reasonable degree of scientific certainty, that both crew members of this airplane were incapacitated by smoke from the in-flight fire involving PVC/nylon insulation.</u>  Because of the low decomposition temperature of PVC and it[s] flammability, the pilots had insufficient time to get the airplane on the ground. These conditions are confirmed by the fact that the airplane was not configured for landing even though the airplane was only 2 to 3 minutes from the emergency landing site when it diverted into trees and houses.

Doc. No. 99-16 at 15-16 (emphasis added).  Thus, Dr. Birky opines that the crash was caused by the incapacitation of the pilots due to the release of HCl from the burning of the PVC wire insulation.  *Id.*

In his report, after describing how he reached the conclusion that the in-flight fire originated in either the propeller syncrophaser or de-ice systems (Doc. No. 99-16 at 1-9), Dr. Birky explains how he reached his conclusions regarding PVC wire insulation and the crews' incapacitation.  Doc. No. 99-16 at 9-15.  Dr. Birky reviewed a 2004 study from the Federal Aviation Administration (the "FAA"), which showed that PVC insulation begins to decompose at 105 degrees Celsius and was the most flammable insulation involved in the test.  Doc. No. 99-16 at 9.  Dr. Birky also conducted laboratory testing on PVC insulated wires which were similar to the PVC insulated wires installed in the Aircraft in 1977.  Doc. No. 99-16 at 9.   Dr. Birky described the testing:

A notch in the insulation was made on one wire in the bundle to expose the copper wire conductor.  28 volts was applied to the bundle. . . .  The bundle was shorted to ground at the notch in the wire insulation.  Electrical arcing occurred during the shorting process and eventually the 20 gauge wire melted through at which time the current was interrupted.  Copper beads formed during the arcing process.  The over current that occurred during the arcing process resulted in melting/burning the insulation on the shortened lead.  Hydrogen chloride was released early during this process. The release of acid gas was confirmed by mounting pH paper above the wire bundle.  The tests were performed in a chemical

hood with the ventilation fan off.  Irritant gases (predominately HCl) escaped the confinement of the chemical hood and it was necessary to evacuate the room.

The laboratory tests confirmed the important steps in the decomposition of PVC wire insulation when a short circuit results in an electrical arc as detailed above regarding the cause of the accident.  First, the arc results in a copper bead (melted copper) that forms in the plasma of the arc.  Second, the wire insulation (PVC) is heated above the decomposition temperature near the plasma and HCl is released.  The plasma from this arc can ignite the PVC and other materials.  In addition, because of the low temperature stability of PVC, the overheated insulation will release more HCl along its length.  The wire insulation eventually bursts into flaming combustion.  The pH paper was suspended above the wires to demonstrat[e] the release of strong acid (HCl).  The arcing tests were also performed on PVC/nylon wire bundles taken from other older airplanes.  These wire[s] performed similarly to the new PVC/nylon insulated wires. . . .

Doc. No. 99-16 at 9-10.  Thus, Dr. Birky performed tests on new and older PVC insulated wires by cutting a notch in the one of the wires, shorting it to a ground, and applying 28 volts of power.  *Id*.  Electrical arcing occurred, the PVC insulation began decomposing, and HCl was released.  *Id*.  Dr. Birky does not state how long it took for the PVC to begin decomposing or how much HCl was released, but enough HCl was released during the testing so that it was necessary to evacuate the room.  *Id*.

In 1986, Dr. Birky published an article entitled "Toxicity and Incapacitation due to Hydrogen Chloride, Fire and Materials."  Doc. No. 99-16 at 11.  Regarding the release of HCl during the heating and combustion of PVC insulation, Dr. Birky states in his report:

[HCl] is classified as sensory and pulmonary irritant.  Because the HCl is released at relatively low temperatures, it will be present in the early stages of [a] fire involving PVC wire insulation.  Toxicity studies on smoke from PVC have used a variety of animals and animal models in an effort to try to understand the effects of irritants on human performance, including incapacitation.  The animal studies range from rodents to non-human primates.  Birky

6

reviewed these studies in an effort to elucidate the incapacitating effects of fires involving PVC.  As detailed in this review, most of the animal models used to assess the incapacitating effects of irritants, such as HCl, are flawed.  The toxicological effects from short exposure to irritants are not manifested until some time after exposure occurs unless the irritant (HCl) concentration is extremely high.   Exposure to strong irritants, depending on concentration, takes some time to develop, and causes post exposure sequel to the respiratory tract.  Death is usually the result of respiratory tract damage.

To address this issue, [Craig S. Barrow's study] used a change in respiratory rate in mice exposed to chemical irritants as a measure of the degree of irritation from hydrogen chloride.  In this study a 50% decrease in respiratory rate was defined as RD(50).  Based on this methodology, the RD(50) for HCl was 309 ppm, or .454 mg/l.  Barrow . . . predicted that "a concentration capable of evoking a 50% decrease in respiratory rate (RD(50)) in mice would induce intolerable sensory irritation that would be incapacitating to humans."  In a follow up study, smoke from a plasticized PVC was studied with the same animal model.  During the exposure of the mice to the thermal degradation products of the PVC, change in respiratory rate occurred at two different stages of the decomposition.  The first occurred starting at about 240 [degrees Celsius] and the second stage at about 400 [degrees Celsius].  The 2 stages in respiratory rate changes correspond to changes in the weight loss of the sample.  The RD(50) for a first weight loss of the plasticized PVC was determined to be 0.19 mg/l.  The second weight loss gave an RD(50) of 0.13 mg/l.  The first sample weight loss was about 55% of the sample and the second was less than 10%.  The authors predicted that exposure to humans to 0.19 mg/l as "Rapidly incapacitating with choking and a burning sensation of the eyes, nose and throat."  This methodology has been used to study 51 airborne chemicals and found to be an excellent indicator of how humans will react when exposed to similar concentrations of these chemicals.

Doc. No. 99-16 at 11-12.  Thus, based upon Dr. Birky's review of animal studies and models, his own work in 1986, and Craig S. Barrow's study, he opines that humans exposed to 0.19mg/l of HCl gas or smoke will experience rapid incapacitation with choking and burning sensations in the eyes, nose, and throat.  *Id.*

Dr. Birky then reviews the autopsy reports and toxicological reports of the Aircraft's pilots.  Doc. No. 99-16 at 12-13.  Dr. Birky states that fire fatality studies show that victims exposed to elevated carbon monoxide levels and other irritants, such as HCl, will have evidence of the same in their blood and upper respiratory tract, including evidence of pulmonary edema from irritants.  Doc. No. 99-16 at 12.  Dr. Birky acknowledges that the autopsy and toxicology reports in this case "did not reveal evidence of carbon monoxide in the blood . . . or soot deposits in the respiratory tract."  Doc. No. 99-16 at 12.  Dr. Birky explains that the reason for these negative findings is "very clear."  *Id.*  He states:

> First, the <u>in-flight exposure duration to fire products was very short and from the early stages of a fire</u>.  The . . . toxicology analysis protocol only reports a value for [carbon monoxide in the blood] above 10%.  Second, the 2 crewmembers did not die as a result of the fire as in the autopsy study cited above.  They were fatally injured in the accident sequence.  Cause of death was reported to be "multiple blunt force trauma."  In fact, <u>exposure to the in-flight fire in this accident was just over 2 minutes.  This was the time between when the emergency was declared (. . . smoke in the cockpit) and the estimate ground impact. . . . Because of the very short exposure time, elevated carbon monoxide . . . would not occur</u> unless this was an intense fire with limited amount of air. . . . Similarly, <u>the exposure time to irritants from the in-flight arcing of electrical wire and heated electrical insulation was insufficient to develop the pulmonary edema before death occurred that is reported in fire death studies, studies on survivors of fires, and firefighter studies</u>.  Also, the crewmembers eyes could not be examined for tissue irritation because of the extensive tissue damage from the post crash fire.

Doc. No. 99-16 at 12-13 (emphasis added).  Thus, Dr. Birky opines that the pilots did not have physical evidence of exposure to high levels of carbon monoxide and other irritants because the toxicology analysis only reported carbon monoxide levels in the blood greater than ten percent, the pilots' exposure to the in-flight fire was short (approximately two minutes between smoke being reported in the cockpit and ground impact), and because of the extensive tissue damage

8

due to the post-impact fire. *Id.* Dr. Birky also states that "[a]ll of the animal studies on irritants confirm that the edema signature to [irritant] exposure is a post exposure phenomena," and "[c]onsiderably longer than 2 minutes is required to develop edema." *Id.* at 13.

Dr. Birky stated the following as to how he concluded that the pilots were exposed to 0.19 mg/l of HCl during the two minutes prior to ground impact:

> [T]he RD(50) for a plasticized PVC was determined by Barrow . . . to be 0.19 mg/l. According to their studies, this concentration would be rapidly incapacitating to humans. In the exposure of mice to the combustion products of plasticized PVC, the exposure time was 2 to 3 minutes, an exposure time comparable to the accident airplane crewmembers. The approximate volume of the [Aircraft's] cabin is 3 to 3.5 cubic meters (3,000 to 3,500 liters). This does not take into account the space tak[ing] up the seats and other hardware. Therefore, we will use 3,000 liters as the approximate cabin volume. To generate the RD(50) concentration in the airplane cabin (0.19 mg/l – lets use 0.2 mg/l) of smoke in this volume would require slightly over one half of a gram (0.6 grams to be exact) of smoke from the PVC wire insulation. According to the above referenced measurements on mice, about 60% of the plasticized PVC weight was lost or converted to gaseous products. This includes both weight loss phases. Based on these parameters, it would take about 1 gram (0.6/0.6) of plasticized PVC wire insulation to fill the cabin volume with smoke concentration equivalent to the RD(50) concentration. Measurement on the [syncrophaser wires] shows there is about 0.44 grams of PVC insulation per foot and about 0.26 grams of nylon per foot. . . . In order to get the 1 gram of smoke (the quantity estimated to cause incapacitation to the crew) from burning plasticized PVC would require the thermal decomposition or burning of 2.3 feet of [the syncrophaser insulated wires]. This is not very much wire insulation as compared to the quantity behind the instrument panel of [the Aircraft].

Doc. No. 99-16 at 13-14 (emphasis added). Thus, Dr. Birky opines that, based upon his calculations, only 2.3 feet of the PVC insulated syncrophaser wires would have had to burn or decompose to incapacitate the pilots. *Id.*

Dr. Birky acknowledges that "[t]here are a number of assumptions that should be

considered" in his analysis, including: "no smoke is lost due to airflow out of the cabin and/or surface absorption;" "instantaneous mixing of the air in the entire cabin volume;" ignoring "the contribution of the nylon covering the PVC insulation;" and "that the plasticized PVC used in the [studies establishing] the RD(50) [rate] is the same as used in the wire insulation in the [Aircraft]." Doc. No. 99-16 at 14 (emphasis added).    As to the comparison of the plasticized PVC used in the RD(50) studies to the PVC used on the Aircraft, Dr. Birky states:

> The biggest difference is likely to be the amount of plasticizer [used]. The wires in the airplane were rather stiff, suggesting a lower percentage of plasticizer. This would simply mean that there is a higher percentage of [PVC] in the wire insulation leading to more HCl produced per foot of insulation. Based upon a review of the assumptions listed above, the exposure to HCl would be greater than the calculation predicts.

Doc. No. 99-16 at 14 (emphasis added).  Thus, because the wires in the airplane were rather stiff, Dr. Birky opines that they had a lower percentage of plasticizer, which would result in a higher percentage of PVC.  *Id.*[2]  Dr. Birky concludes that the PVC insulation on the Aircraft would emit a higher concentration of HCl per foot of insulation than concentrations emitted in the RD(50) studies.  *Id.*

Regarding the airflow assumption, Dr. Birky states that "the most important factors are the cabin air mixing rate and ventilation rates."  *Id.*  Dr. Birky also makes certain assumptions regarding those factors, stating:

> It should be noted at this point that there is a ventilation fan behind the instrument panel to cool electrical equipment.  This fan will help move the irritant smoke generated behind the instrument panel into the space occupied by the cockpit crew, so that instantaneous mixing, as far as exposure of the crewmembers is concerned, is probably a very good assumption.  Because the crew is very close to the source of the fire, they will be exposed very

---

[2] Although it is unclear from his report, the Court assumes that Dr. Birky is comparing the plasticized PVC insulated wires in the Aircraft versus those plasticized PVC insulated wires in the RD(50) study.

quickly and uniform mixing is not required, so it will take less time and quantity of smoke to reach the incapacitating concentration for the crew. <u>The cabin ventilation system will also enhance the smoke mixing rate. The ventilation rate can be taken into account if it is known. For example, if it is assumed that the cabin ventilation rate or air exchange rate is a complete air change every 2 to 3 minutes (an unreasonably high rate), it would require the combustion of about 2.3 feet of wire every 2 to 3 minutes. This is not a high rate of combustion in a fire. A more reasonable ventilation rate would be a complete cabin air exchange every 30 minutes. This simply means that a combustion rate of 0.09 inches of wire insulation per minute would be incapacitating. A combustion rate of 2 feet per minute would cause an irritant concentration that would be almost instantaneously incapacitating.</u> The third assumption is that in the calculation above, nylon did not contribute to the smoke irritation. Because smoke from burning nylon will also cause irritation, ignoring this factor will lead to an overestimate of the length of wire required to cause incapacitation. <u>So in all cases the assumptions lead to a conservative estimate of the amount of wire insulation required to cause incapacitation from an electrical fire.</u>

Doc. No. 99-16 at 14 (emphasis added). Therefore, although the cabin air mixing and ventilation rates are unknown, Dr. Birky makes assumptions about their respective rates, and concludes that instantaneous air mixing likely occurred and the ventilation rates were such that pilots were almost instantaneously incapacitated. *Id.* Furthermore, Dr. Birky states that consideration of all the assumptions he makes leads to the conclusion that his estimates for the amount of decomposing PVC wire insulation required to incapacitate the pilots are conservative. *Id.*[3]

Dr. Birky states that his conclusion that the pilots were incapacitated "very quickly, <u>probably within 2 minutes of the reported smoke in the cockpit,</u>" is also supported by "the fact that the airplane was not configured for landing even though the airplane was estimated . . . to be about 3 minutes from its emergency destination when it veered sharply to the right." *Id.* at 15

---

[3] In his report, Dr. Birky does not provide further discussion of his assumption that "no smoke was lost due to airflow out of the cabin." Doc. No. 99-16 at 14. Earlier in his report, Dr. Birky notes that eye witnesses to the accident reported that the Aircraft was "'trailing smoke'" before impact. *Id.* at 4.

(emphasis added).[4]

### B.  Orion P. Keifer.

Orion P. Keifer is the principal mechanical engineer of Applications Engineering Group,

Inc. and is involved in forensic engineering which investigates "various types of accidents,

mishaps, failures, and [tries to] determine what happened. . . ."  Doc. Nos. 99-19 at 4; 84-1 at 7.[5]

Mr. Keifer's role in this case was to assist Dr. Birky with the testing of exemplar PVC insulated

wires, which is also described in Dr. Birky's report (*see* Doc. No. 99-16 at 9-10).  Doc. No. 84-1

at 15.  Mr. Keifer's report describes that testing and he makes the following conclusions:

1.  The Aircraft connector with the beaded wires . . . was . . . the Propeller Syncrophaser control module;
2.  Over current, arcing and external heat can cause the ignition of PVC insulated wire;
3.  When PVC burns, it produces significant smoke, an acrid odor and acidic vapors; and
4.  Tefzel wire insulation appears to be more resistant to supporting flames than PVC wire insulation.

Doc. No. 99-19 at 4.  In his report, Mr. Keifer did not offer any opinion as to whether the pilots

were incapacitated due to smoke or fumes containing HCl.  *See* Doc. No. 99-14.

Although Mr. Keifer has not offered the Causation Opinion directly at issue in the

Motion, during his deposition the following exchanges occurred:

> Q.    Do you have any correlation between the pH test paper ranges and the impact, physiological impact on the human body, anything like that with the ranges that says this one is going - - if you have this much acid gas at this concentration, it's going to be fatal or incapacitating, et cetera?
>
> A.    None that I'm aware of.  I think that would be, you know, something that Dr. Birky would look at what may exist in

---

[4] As stated in Dr. Birky's report, "[t]he total time between the first transmission regarding smoke in the cockpit and the accident was about 2 minutes 11 seconds."  Doc. No. 99-16 at 4.
[5] Mr. Keifer's curriculum vitae has not been provided to the Court.

that area. . . . But, you know, the literature shows that hydrochloric acid is a primary component [in outgasing from burning PVC insulation].  But pH paper - - you know, legitimately pH paper just tells you that there's an acid.  Testing for [HCl] in a quantitative manner is a little more difficult . . . [and] we didn't think it was necessary for our purposes.

Q.    Tell me about the relationship between time of exposure and what we can learn from the pH paper.  Will weak acidic gas exposure over a longer duration period of time appear the same on the pH paper as a strong or high concentration of acidic gas over a shorter time?

A.    . . . . I would think that the way that we were using this pH paper is time would matter. . . . So, you know, an exposure to less [HCl] over some time, it probably would demonstrate a higher pH. . . .

Q.    Did you make any effort to record the start and stop times that the pH papers were exposed to acid gas?

A.    No. . . .

Q.    Did you record how much insulation produced substantial smoke and an acrid smell in either inches or volume or some other - -

A.    No.  We were not trying to quantify that. . . .

Q.    Was any attempt made to determine from testing how much acid gas was released for a certain number of inches of insulated wiring?

A.    No.  We were not attempting to quantify those issues.

Q.    Did you quantify the rate at which acid gas was released from burning insulation?

A.    No.  That's a difficult one to do, by the way.

Q.    Can it be done, do you think?

A.    Well, we were looking at doing it for the entire cockpit.  And the methods to quantify that is you draw in a sample

> through a gel and then you analyze the gel.  So you have to
> - - for each test and time you have to have a different set of
> apparatus to pull those in and it's a rather complicated hit
> or miss thing.  It's not like - - you know, there's certain
> things where you have a meter.  You can just stick a probe
> in there and you hook up to a probe and away you go and
> you can measure it.  Well, the best we can understand is
> there's no such probe for [HCl]. . . Otherwise, we probably
> would have done that.   But, you know, it was very
> complicated to get, you know, a time concentration.

Doc. No. 84-1 at 53-58.  Mr. Keifer testified that he did not record the start and stop times

between exposure to the pH paper and when the pH paper indicated the presence of acid gas.  *Id*.

Mr. Keifer also stated that he did not measure how many inches of burning PVC were required to

produce substantial amount of HCl.   *Id*.   Furthermore, Mr. Keifer testified that he did not

measure the time concentration rate of HCl exposure and explained the difficulty and

methodology for undertaking such a measurement.  *Id*.

### C.  Gregory A Feith.

Gregory A. Feith was retained by NASCAR "as an expert in the field of aviation safety

and aircraft accident reconstruction, to review the facts, conditions and circumstances that

resulted in the crash. . . ."  Doc. No. 99-18 at 3.  Mr. Feith is an experienced pilot and has over

twenty years experience as a senior air safety investigator, international accredited

representative, field investigator, unit supervisor, and interim regional director with the National

Transportation Board (the "NTSB").  Doc. No. 99-17 at 2-5.  Mr. Feith has testified as an expert

in accident investigation and reconstruction.  *Id*. at 6.

In his report, Mr. Feith makes the following conclusions:

> 1.  The aircraft was manufactured with PVC wiring that has been
>     determined to be highly flammable, and capable of emitting
>     toxic [HCl] gas. . . .;

14

2. There is no definitive evidence that indicates that neither of the two pilots . . . reviewed the maintenance discrepancy report form that described the weather radar electrical issue experienced . . . the day before the accident flight. . . .;

3. . . . . Based on the information reviewed, it is apparent that at least one pilot, and most likely both pilots were aware of the electrical issue with the weather radar. . . .; and

4. Although the information developed during the NTSB investigation concludes that one of the pilots may have intentionally re-set the circuit breaker and re-energized the electrical circuit to the weather radar (which the [NTSB] concluded was the source of the in-flight fire), there is no evidence to suggest that, 1) the pilot performed that action; and 2) it is both illogical and senseless to believe that a prudent pilot would have reset the circuit breaker. . . .

Doc. No. 99-18 at 10-12.[6]  In the conclusion section of his report, Mr. Feith does not address the

Causation Opinion.  *Id.*  However, in the body of his report, Mr. Feith states:

> In the 1970's, the studies revealed that PVC wire deteriorated and cracked, and that when exposed to elevated heat or fire, it was highly flammable and capable of producing dense smoke and very toxic fumes that could significantly reduce visibility within the cockpit, and render the pilot incapacitated in a very short period of time. . . .
>
> The rapid onset and growth of the fire was due to the flammability of the PVC wire, and possibly the breach of the fuel line that feeds the fuel pressure gauge that also resides behind the right side of the instrument panel.  Neither of these components are located near the weather radar. . . .
>
> Some studies have shown that a hidden fire may initially be difficult to confirm and the pilot(s) may be slow to initiate an emergency landing.  However, it is apparent from the information reviewed related to this accident, that the initial radio communication by the Safety Pilot, in concert with the radar data revealed that at least one pilot was initially capable of

---

[6] Mr. Feith's opinions have been shortened purposes of this Report and Recommendation.  Doc. No. 99-18 at 10-12. In Appendix B to his report, Mr. Feith does not list Dr. Birky's report as having been reviewed as part of the basis for his opinions.

communicating coherently, and one pilot was initially capable of maneuvering the airplane in a manner that was consistent with their request to deviate from the intended route of flight to execute an emergency landing at Sanford.   Although the [NTSB] concluded that, "After analyzing the available evidence, it was not possible to definitively determine the events that led to the accident airplane's maneuvers away from Orlando Sanford International Airport," it is readily apparent that the cause for the diversion from the flight track and subsequent crash of the [Aircraft] can be explained, contrary to the [NTSB's] conclusion.   This is evidenced by the fact that less than 120 seconds after the request was made to divert to [Sanford], the airplane was initially maneuvered on a direct heading toward Sanford, but shortly thereafter, deviated significantly in heading, altitude and groundspeed.   <u>These deviations</u> (rapid descent, groundspeed acceleration (to at least 180 knots) and heading away from the airport) <u>are consistent with the airplane operating in an uncontrolled manner due, most likely to the incapacitation of both pilots from the [HCl] that was inhaled from the burning PVC wiring</u>. . . .

Doc. No. 99-18 at 4, 8 (emphasis added).   Thus, although it is not stated in the conclusion section of his report, Mr. Feith does opine that the pilots were most likely incapacitated from inhaling burning PVC insulation.   *Id*. at 8.   In his report, Mr. Feith does not specifically identify any basis for his opinion that the pilots were incapacitated due to inhaling HCl.   *Id*. at 4, 8.

During his deposition, Mr. Feith testified that he has not conclusively determined the origin of the in-flight fire. Doc. No. 83-1 at 49.   Later in the deposition, Mr. Feith testified:

Q.    Is there something about the flight profile that points to incapacitating due to [HCl]?

A.    <u>I think that's in combination to all of the other things</u>. . . . <u>The fact is that while I'm not a toxicologist</u> and it's been testified and - - and discussed numerous times about what was or what wasn't in the autopsy and the tox reports of both pilots, <u>my understanding of what is offgassed out of PVC wiring when it burns is an irritant, whether it's inhaled and incapacitates, to what extent I'm not sure.</u> But it is an incapacitating gas. . . . <u>And because of the sooting and the smoke that is produced by the PVC wire, it probably contributed to dense smoke, which, again, is irritant, and would have incapacitated the pilots.   Maybe not necessarily from a</u>

16

> physical standpoint where it caused them to pass out, but it
> incapacitated them from being able to control the airplane using
> whatever means necessary, whether it was flight controls, visual
> orientation out the window, instrumentation, whatever the case
> may be, to render the airplane uncontrollable because it deviated
> from a direct line to Sanford. . . . And because of the configuration
> of the airplane, gear up, flaps up, high rate of speed, high rate of
> descent, that to me does not suggest that they were trying to put the
> airplane down in a controlled manner.

Doc. No. 83-2 at 34-36 (emphasis added).  Thus, Mr. Feith testified that due to the deviation in the flight path and state of the Aircraft at the time of impact, he concluded that the pilots were incapacitated in terms of their ability to control the Aircraft due to intense smoke and HCl gas. *Id.*  However, Mr. Feith also testified that he is not a toxicologist and is "not sure" of the extent to which HCl incapacitates an individual when inhaled.  *Id.*[7]

**D.  Stephen J. Nelson, M.D.**

Dr. Stephen J. Nelson is a forensic pathologist and the chief medical examiner for the Tenth Judicial Circuit of Florida.  Doc. No. 99-15 at 2-10.  Dr. Nelson has published numerous articles in his chosen field and testified as an expert witness regarding anatomic pathology, forensic pathology, and neuropathy.  Doc. Nos. 99-15 at 10-21; 86-1 at 19.  Dr. Nelson was retained by NASCAR to review the autopsy reports and to "[r]ender an opinion about what the cause of death was, if there was any discrepancies with the medical examiner's office that performed the original autopsies."  Doc. No. 86-1 at 6.  In his report, after concluding that there were no discrepancies in the original autopsy reports and the pilots died from multiple blunt force trauma, Dr. Nelson states:

> PVC has the special problem of forming [HCl] when it degrades.
> PVC is a combustible thermoplastic material. . . .  PVC is
> commonly used as the insulation on electric wire; the plastic used

---

[7] During the deposition, Mr. Feith was not questioned about the 1970's studies discussed in his report.  See Doc. Nos. 83-1; 83-2.

for this purpose needs to be plasticized.  In a fire, PVC coated wires can form [HCl] fumes. . . . Combustion [of PVC products] will cause eye, nose and throat irritation.  Prolonged exposure to combustion products may cause bronchospasm in individuals with bronchial asthma.  The closed fuselage of an aircraft is a confined space and the occupants would have likely inhaled the toxins produced in an in-flight fire, such as highly soluble [HCl] gas.

There are certain common effects of inhaled toxins.  Most inhalation injuries result in direct damage to the lining of the respiratory tract.  Symptoms that the aircraft occupants would have experienced include constriction of the bronchi, an increase in mucus production, reduced function to expel that phlegm, and ultimately, death of the lining cells.  If the exposure is long enough or toxins present in high concentrations, sloughing of the epithelium will occur.  This can, in turn, cause blockage of the airway by those sloughed cells and epithelial cell lining.  Loss of mucous from removing inhaled particulates so that this loss of function causes further clogging of the airway and eventual lung collapse (atelectasis).

A very import practical factor is that the presence of [HCl] can be sensed only at 0.8ppm due to its pungent odor (and thus serves as an evacuation signal at the site of the fire/incident), whereas carbon monoxide remains the most dangerous gas in a real fire accident, as it is odorless and anesthetic. . . .

While the decomposition products from burnt PVC would not claim human lives, these individuals did not die from the decomposition products of PVC.  <u>They were likely incapacitated from the burned and burning PVC and the toxins emitted by such a fire</u>.  Mr. Klemm and Dr. Kennedy died from injuries they both sustained in the subsequent airplane crash.  <u>If they had not been incapacitated, they may well have survived</u>. . . .

Doc. No. 99-22 at 2-5 (emphasis in original, added, and omitted).  Thus, Dr. Nelson opines that

the pilots were incapacitated due to HCl exposure, causing the crash.  *Id*.  In his report, Dr.

Nelson states that he reviewed the autopsy reports and the NTSB's report.  Doc. No. 99-22 at 2.

Dr. Nelson also cites to three articles regarding PVC toxicity in fires.  Doc. No. 99-22 at 4 notes

2-4.

18

At his deposition, Dr. Nelson testified that he is not an engineer, a chemist, a pilot, has no experience in aviation accident investigations other than determining cause of death, has never determined a cause of death in an airplane crash to be HCl exposure, has no training or experience in the flammability of materials, and has no training or experience in combustion toxicology.  Doc. No. 86-1 at 27-36.  During the deposition, Dr. Nelson testified:

Q. On page 2 of your report you have a paragraph talking about PVC and the degradation of PVC.  And the statement appears that PVC has the special problem of forming hydrochloric acid when it degrades.  <u>What is the basis for your knowledge in the area of PVC or the formation of HCl with the combustion of PVC</u>?

A. I was provided by [NASCAR] that the wiring in the plane contained PVC.  And then the question is, what are the toxic hazards associated with PVC.  So <u>this is pretty straightforward forensic pathology for the issue of burning PVC, how PVC degrades, what it does, some of the hazards associated with it and the associated literature search that was done and the subsequent three articles that are attached</u>.

Q. Your information that PVC wiring was contained in subject aircraft comes from where?

A. [NASCAR]. . . .

Q. Do you know with any certainty with respect to the wiring in the aircraft what percentage was PVC wiring versus non-PVC wiring?

A. No.

Q. With respect to your opinions in this case, are you making any assumptions as to the quantity of PVC wiring in the plane?

A. No.

Q. Are you making any assumptions as to the quantity of PVC wiring in the plane that burned or degraded prior to the

crash?

A.      No.

Q.      The information in your report about the combustion of
        PVC and the emissions from combustion of PVC, where
        does that information come from?

A.      As I say, that's pretty standard textbook literature on how
        PVC degrades.

Q.      Are those statements from your knowledge as a forensic
        pathologist in your background and training or do they
        come from outside sources?

A.      They could come from a variety of things. They could
        come from literature, they could come from textbooks, they
        could come from independent knowledge regarding the
        chemicals. . . . It's most likely a combination of literature
        as well as standard textbooks that deal with aviation crash
        investigation. . . .

Q.      The effects of emissions from the combustion of PVC,
        were these things known to you prior to your retention in
        this case?

A.      Yes. . . .

Q.      The next paragraph on Page 2 of your report, Dr. Nelson,
        begins with the statement that PVC is commonly used as an
        insulation on electric wire.  My question is the same.
        What's the basis for those statements or knowledge?

A.      Again, it's electrical knowledge, electricity, those types of
        cases that we as forensic pathologists are involved in.

Q.      Again, that's something that you knew prior to retention in
        this case?

A.      Yes. . . .

Q.      Dr. Nelson, I take it from your report it's your opinion that
        the occupants of the plane were exposed to HCl in flight?

A.      Yes.

20

Q.      What is the basis of your opinion that the occupants were exposed to or inhaled HCl prior to the crash?

A.      Well, we know the wires contained PVC and that as that burns, we know there is an in-flight fire.  It would not be typical that if there is an in-flight fire that contains wires made insulated with PVC that they would not be exposed to degradation byproducts of PVC when we know there is an in-flight fire and we know something incapacitated them, that they were on a relatively straight shot into Orlando/Sanford International Airport, having declared that emergency, and then they suddenly veered off and into those home.  They had the runway in sight, at least the tower could see them, and suddenly they veered off. . . .

Q.      . . . . What is your basis of saying that the occupants became incapacitated at all?

A.      Well, they declared an emergency that there's smoke in the cockpit.  Smoke in the cockpit for any plane is not a good thing.  You can't see through the windscreen.  You can't read your instruments.  That's not a good thing.  So that, to me, is pretty straightforward that they would be incapacitated, even just visually incapacitated in not being able to see their instruments, visually incapacitated by the fact that they've got their eyes burning, their throat is burning, they're gasping for good, clean air because they're breathing smoke.  That would be incapacitation. . . .

Q.      In summation, Dr. Nelson, would you agree with me that there was no clinical, toxicological or pathological evidence in this case that the occupants were exposed to HCl?

A.      Yes, there is no evidence that they were exposed to that. However, as I've said many times in this deposition, the amount of time required to show those clinical signs would be longer than the flight this aircraft.

Doc. No. 86-1 at 41-45; 86-2 at 4-5, 26, 31 (emphasis added).  Thus, even though Dr. Nelson

acknowledged that he has no experience in aviation accident investigation other than determining

cause of death, there is no clinical, toxicological, or pathological evidence that the pilots were

21

exposed to HCl gas, and that he was only retained to render opinions regarding the cause of

death, he opines that the cause of the crash was the pilots' incapacitation due to exposure to HCl.

*Id*.

### E.  Douglas E. Stimpson.

Douglas E. Stimpson is an experienced pilot and aviation mechanic who owns and

operates Accident Investigation & Reconstruction, Inc.  Doc. No. 99-21 at 1-4.  Mr. Stimpson

has personal experience with an in-flight fire.  Doc. No. 85-2 at 32.  Mr. Stimpson provides

aviation accident reconstruction regarding piloting, maintenance, failure analysis, compliance

with Federal Aviation Regulations and Aircraft Certification, wreckage investigation, and

aircraft manufacturing.  *Id*. at 4.  Mr. Stimpson has testified as an expert regarding accident

investigation and reconstruction, piloting, and aircraft maintenance and certification, including

cases involving alleged incapacitation of pilots due to an in-flight fire.  Doc. Nos. 99-20 at 18-

37; 85-1 at 23-24; 99-21 at 7.

In his report, Mr. Stimpson states that "[s]tudies have shown that PVC wiring insulation

will burn quickly and releases incapacitating, toxic fumes when burned."  Doc. No. 99-20 at 10-

11.  Mr. Stimpson conducted flammability tests on exemplar PVC insulated wires in an exemplar

Cessna 310R fuselage by subjecting them to an electrical overload as well as a flame test of the

wire itself.  Doc. No. 99-20 at 12. Mr. Stimpson states:

> The tests confirmed that the PVC wiring installed in the [Aircraft]
> would emit large quantities of toxic smoke and fumes when
> subjected to electrical overload or flames.   The tests also
> confirmed that a pilot attempting to fly [an] aircraft when this
> occurs would become immediately overcome with foul debilitating
> smoke.  It was also noted that when the exemplar PVC harness was
> exposed to a small flame for less than 15 seconds, it became self-
> propagating and the smoke changed color from a grey to a darker
> black.  This darker black smoke was similar to the sooting seen on

> the accident aircraft inner panels and entrance door.  This would indicate that the PVC electrical fire in the [Aircraft] was self propagating at the time the crew was attempting to land at the Sanford Airport.

Doc. No. 99-20 at 12.  Although, in his report, Mr. Stimpson does not describe with particularity the testing performed in the exemplar fuselage, the Court assumes that the test occurred in a laboratory or controlled environment on the ground. *See* Doc. No. 99-20 at 12.[8]

In the "OPINIONS" section of his report, Mr. Stimpson concludes:

> The accident flight crew was overcome by toxic smoke and fumes that were emitted by the PVC wiring that was installed in the aircraft.  PVC wiring is known to burn quickly and to release toxic smoke and fumes when burned. . . . <u>The cause of this accident was the flight crew becoming incapacitated by the toxic fumes and smoke</u> created when PVC wiring is subject to a heat source for a short period of time and its ability to self propagate once a fire is ignited.

*Id*. at 14-15 (emphasis added).  Thus, based on his training and experience, other studies and Mr. Stimpson's flammability testing on exemplar PVC wiring, Mr. Stimpson concludes that the cause of the crash was pilot incapacitation due to burning PVC insulation.  *Id*.

In Mr. Stimpson's deposition, he testified as follows:

> Q.    Under Exemplar Wiring Test, second paragraph under that subheading, "The test confirmed that the PVC wiring installed in the [Aircraft] would emit large quantities of toxic smoke and fumes when subjected to electrical overload or flames."  Did you quantify – or have you quantified large quantities?
>
> A.    Yeah. . . .  In other words, large to where there is no question it's an absolute blackout.
>
> Q.    Okay.  Then it goes on to, "The test also confirmed that a pilot attempting to fly the aircraft when this occurs would become immediately overcome with foul debilitating

---

[8] The conclusions Mr. Stimpson reached from the testing in the exemplar fuselage were questioned during his deposition, but the manner and methodologies employed were not discussed.  *See* Doc. No. 85-2 at 26-32.

smoke." Those two paragraphs are - - raise the question of timing. Define for me, if you would, immediately. Is that immediately upon the first notice of smoke, or is it immediately upon reaching that point of you definition of large quantities?

A.    . . . . Here is how I established this. <u>And one of the purposes of the tests was to look at the color of the smoke and the quantity of the smoke</u> and what that would mean to the crew. <u>And once the smoke becomes the color that the [ground witness] saw . . . once we establish that, you know,</u> the situation, <u>what happens next</u> is that two things occur in the test. One is that the cockpit is completely clouded up very - - I mean, to where you couldn't see your hands in front. * * * * And so as the smoke is emanating, as it's coming around you, even though you can't see it, the smell is foul and it does - - you can feel it irritating your eyes and your nose and your mouth. You know, it's one of those where you just want to run away from it, so it's one of those sharp chemical-like reactions.

Q.    . . . . Certainly the cloud, the volume of smoke - - the quantity of smoke you're talking about there would impede the pilot's ability to see out of the aircraft, correct?

A.    Correct.

Q.    Would it - - this large quantity you've described here, would it also impede the pilot's ability if they could keep their eyes open - - let's throw out the part of the equation that deals with an irritant - -

A.    Visibility.

Q.    - - to close your eyes. Could they see the instrument panel?

A.    Okay. What I learned from the test was that in a large amount of smoke you might not be able to see out, but in this case, because of the type of gas that it is - - again, I'm not a chemist - - but it immediately reacts to your eyes. So even though you can see maybe out - - in other words, this is before it starts to billow out the door where it gets black . . . you can't see. So yeah, if you had the ability not to get it in your eyes, you might be able to see out and fly. But once it's around even in a much lesser quantity, you can't

24

> see. It's basically closing your eyes, tearing your eyes. And again, I wouldn't stay in it long enough to be incapacitated in a test. But just being exposed to it, the first thing that happens is you - - just your eyes just immediately want to repel from it.
>
> Q.     With this crash, the pilots reported at a time we know smoke in the cockpit. . . . At that point when they could see smoke in the cockpit were their eyes being affected such that it was an irritant and they couldn't keep their eyes open?
>
> A.     I think it was an irritant at that point. . . . And I think that even if it had been exposed over time at that level, <u>it would have been very debilitating</u>, again, <u>because of the type of gas it is</u>.

Doc. No. 85-2 at 27-31 (emphasis added). Thus, Mr. Stimpson testified that when PVC insulated wiring burns it produces enough quantities of smoke to form a complete blackout of an aircraft's cockpit. *Id.*[9] Mr. Stimpson also testified that even before the quantity of smoke reaches the level of a complete blackout, the pilots would already be incapacitated in terms of their ability to fly the Aircraft due to the irritants contained in the smoke. *Id.* Mr. Stimpson stated that he did not know what type of wiring was involved in his in-flight fire, but the smoke was "foul." Doc. No. 85-2 at 32.

**III.**    <u>ANALYSIS.</u>

    **A.** ***DAUBERT.***

Federal Rule of Evidence 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable

---

[9] Mr. Stimpson did not state the quantity of PVC insulated wiring that was burned in his testing.

> principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.  In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) and *Daubert*, 509 U.S. 579, the Supreme Court held that the trial court must perform a "gatekeeper" function designed to ensure that any and all expert testimony is both relevant and reliable.  "The burden of laying a proper foundation for the admissibility of an expert's testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence."  *Hall v. United Ins. Co. of America*, 367 F.3d 1255, 1261 (11th Cir. 2004).  The party offering the expert has "the burden to show that his expert [is] 'qualified to testify competently regarding the matters he intend[s] to address; [] the methodology by which the expert reache[d] his conclusions is sufficiently reliable; and [] the testimony assists the trier of fact.'"  *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002) (quoting *Maiz v. Virani*, 253 F.3d 641, 664 (11th Cir. 2001)).

In *Daubert*, the Supreme Court identified the following non-exclusive list of factors a court should consider when determining the admissibility and reliability of expert testimony:

1) whether the expert's methods or techniques can be or have been tested;
2) whether the technique, method, or theory has been subject to peer review and publications;
3) whether the known or potential rate of error of the technique or theory when applied is acceptable; and
4) whether technique, method, or theory has been generally accepted in the scientific community.

509 U.S. 579, 594-95 (1993).  In *Kumho Tire Co.*, the Supreme Court held that the *Daubert* factors applied not only to expert testimony based on scientific knowledge, but also to expert testimony based on general principles, technical knowledge, and other specialized knowledge. 526 U.S. 137, 141 (1999).  Nonetheless, the trial court's "gatekeeping" function "'inherently

require[s] the trial court to conduct an exacting analysis' of the *foundations* of expert opinions to ensure they meet the standards for admissibility under Rule 702." *U.S. v. Frazier,* 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *McCorvey*, 298 F.3d at 1257) (emphasis added). "[N]othing in either Daubert or the Federal Rules of Evidence requires a . . . court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elect. Co. v. Joiner*, 522 U.S. 136, 146 (1997).[10]  The Eleventh Circuit has stated:

> Given the time, information, and resources, courts may only admit the state of science as it is.  Courts are cautioned not to admit speculation, conjecture, or inference that cannot be supported by sound scientific principles. The courtroom is not the place for scientific guesswork, even of the inspired sort.

*Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (2010) (internal quotations and citation omitted).  Therefore, in performing its gatekeeper function the Court must determine what is sufficiently reliable based on the general, technical or specialized knowledge being applied and the methodology used to apply it.

It is not the province of the trial court to make "ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Technology DC-8 v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).  "Quite the contrary, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'"  *Quiet Technology*, 32 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596).  For instance, if an analysis or study is based on inaccurate date, such flaws are more appropriate for cross-examination.  *See Quiet Technology*, 326 F.3d 1333, 1345 (11th Cir. 2003) (citing *Daubert*, 509 U.S. at 596).  "[I]n most cases, objections to the inadequacies of a study are more appropriately considered an

---

[10] *Ipse dixit* means: "He himself said it; a bare assertion resting on the authority of an individual."  Black's Law Dictionary (Rev. 4th Ed. 1968).

objection going to the weight of the evidence rather than its admissibility." *Quiet Technology*, 326 F.3d at 1345 (quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002)). According to the Supreme Court, the "failure to include variables will affect the analysis' probativeness [rather than] its admissibility." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986). Thus, "[s]o long as the expert's testimony rests upon 'good grounds,' it should be tested by the adversary process-competing expert testimony and active cross-examination-rather than excluded from jurors['] scrutiny for fear that they will not grasp its complexities or satisfactory [sic] weight its inadequacies." *Quiet Technology*, 326 F.3d at 1345 (internal citations and quotations omitted). Moreover, "[e]xperts routinely rely on the work of others, a practice permitted by Fed.R.Evid. 703, so long as the facts or data on which they rely is of the type reasonably relied on by experts in the relevant field." *City of St. Petersburg v. Total Containment, Inc.*, 2009 WL 3335013 at *4 (S.D. Fla. 2009) (citing *CBS, Inc. v. PrimeTime 24 Joint Venture*, 9 F.Supp.2d 1333, 1342 (S.D. Fla. 1998)).

### 1.  Dr. Birky.

Cessna generally argues that each of the experts challenged in the Motion are unqualified to render the Causation Opinion.  Doc. No. 81 at 16.  Based upon Dr. Birky's training and experience as set forth above, it is recommended that the Court find he is qualified to render the Causation Opinion contained in his report.  Doc. Nos. 99-14 at 3; 99-16 at 2; *McCorvey*, 298 F.3d at 1257 (expert must be qualified to testify competently concerning matters he intends to address).

Dr. Birky opines that the cause of the crash was pilot incapacitation due to inhalation of HCl gas which was produced by burning PVC insulated wire in the Aircraft's propeller syncrophaser system.  Doc. No. 99-16 at 15-16.  The basis for his Causation Opinion is a series

of calculations and assumptions.  First, based on the RD(50) study of mice, which he states is an accurate prediction of the effect gases would have on humans, Dr. Birky concludes that humans exposed 0.19 mg/l of HCl will experience rapid incapacitation, including choking and a burning sensation of the eyes, nose, and throat.  Doc. No. 99-16 at 12.  Second, based upon the approximate volume of the Aircraft's cabin (3,000 liters), Dr. Birky calculates that it would take 1 gram of smoke from PVC wire insulation to fill the cabin with intoxicating levels of HCl.  Doc. No. 99-16 at 13-14.  Third, based upon 0.44 grams of PVC insulation per foot on the syncrophaser wires, Dr. Birky calculates that in order obtain 1 gram of smoke, only 2.3 feet of PVC insulated wires would need to burn.  *Id.*

Dr. Birky ultimately opines that the 2.3 feet of PVC wire insulation burned and incapacitated the pilots "very quickly, probably within 2 minutes of the reported smoke in the cockpit."  Doc. No. 99-16 at 15.  Dr. Birky based his calculations on four assumptions: 1) no smoke was lost due to airflow out of the cabin; 2) there was instantaneous air mixing of the HCl in the entire cabin volume; 3) ignoring the nylon covering of the PVC insulation; and 4) that the plasticized PVC used in the RD(50) studies is the same plasticized PVC used in the Aircraft.  Doc. No. 99-16 at 14.  Importantly, Dr. Birky assumes air mixing and ventilation rates and ignores the possibility that any HCl smoke was lost due to air flow out of the cabin.  These assumptions are critical to Dr. Birky's ultimate opinion because "[t]he total time between the first transmission regarding smoke in the cockpit and the accident was about 2 minutes 11 seconds."  Doc. No. 99-16 at 4.

While Dr. Birky is qualified to offer opinions as to fire cause and origin and that PVC wire insulation gives off HCl, a known irritant, when burned, his ultimate Causation Opinion is based numerous assumptions which will no doubt be called into question at trial. "Vigorous

29

cross-examination . . . [is] the traditional and appropriate means of attacking shaky but admissible evidence*." Quiet Technology*, 326 F.3d at 1345 (internal quotations omitted).  Thus, a study's inadequacies or the failure to include variables will affect the opinion's probativeness rather than its admissibility. *See Id*.; *Bazemore*, 478 U.S. at 400.   Moreover, it is appropriate for an expert to rely, in part, on circumstantial evidence and assumptions if the ultimate opinion upon which they are based logically connects conditions existing later to those existing earlier. *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662-63 (11th Cir. 1988). Therefore, it is recommended that the Court find that Dr. Birky's opinion is based upon sufficient facts, is the product of reliable principles and methods, and would be helpful to the trier of fact.   Accordingly, it is recommended that Motion be denied as to Dr. Birky.

### 2.  Mr. Keifer.

Mr. Keifer is a forensic and mechanical engineer who investigates "various types of accidents, mishaps, failures, and [tries to] determine what happened."  Doc. Nos. 99-19 at 4; 84-1 at 7.  In neither his report nor during his deposition did Mr. Keifer offer the Causation Opinion. *See* Doc. Nos. 99-19; 84-1.   Accordingly, while Mr. Keifer may be qualified to offer the Causation Opinion, because he did not do so, it is recommended that the Court deny the Motion as to Mr. Keifer.

### 3.  Mr. Feith.

Mr. Feith has over twenty years experience as an aviation accident investigator with the NTSB and is an experienced pilot.  Doc. No. 99-17 at 2-5.  Mr. Feith has testified as an expert in accident investigation and reconstruction.  *Id*. at 6.  Mr. Feith offers two related opinions as to the issues raised in the Motion.  First, Mr. Feith opines that the Aircraft's flight deviations are consistent with the airplane operating in an uncontrolled manner.  Doc. No. 99-18 at 8.  Second,

30

Mr. Feith opines that Aircraft was operating in an uncontrolled manner "due, most likely to incapacitation from the [HCl] that was inhaled from the burning PVC wiring." *Id*. The Motion only challenges Mr. Feith's second opinion, the Causation Opinion.

Mr. Feith testified that although he understood that burning PVC produces HCL, which is a known irritant, he was unsure of the extent to which HCl incapacitates an individual. Doc. No. 83-2 at 34-36. In his report, Mr. Feith did not identify the basis or methodology he used to conclude that the pilots were incapacitated due to inhaling HCl. Doc. No. 99-18 at 4, 8. "[A]n expert's failure to explain the basis for an important inference mandates exclusion of his or her opinion." *Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1344 (11th Cir. 2003). Accordingly, it is recommended that the Motion be granted as to Mr. Feith's Causation Opinion.

### 4. Dr. Nelson.

Dr. Nelson is a forensic pathologist and the chief medical examiner for the Tenth Judicial Circuit, who was retained to review the autopsy reports and to render an opinion as to the pilots' cause of death. Doc. Nos. 99-15; 86-1 at 6. Dr. Nelson has testified as an expert witness regarding anatomic pathology, forensic pathology, and neuropathy. Doc. No. 86-1 at 19. Dr. Nelson offered two opinions in this case: 1) there were no discrepancies in the autopsy reports and the pilots died from multiple blunt force trauma; and 2) the crash was caused due to pilot incapacitation from inhalation of HCl produced by burning PVC wire insulation. Doc. No. 99-22 at 1-5. The Motion only challenges the second opinion, the Causation Opinion.

Dr. Nelson testified that he has no experience in aviation accident reconstruction, piloting, mechanics, engineering, metallurgy, or flammability analysis. *See* Doc. Nos. 99-22 at 5; 86-1 at 27-36. He also testified that his knowledge of PVC wire insulation and its degradation were "pretty straightforward forensic pathology." Doc. No. 86-1 at 41. Dr. Nelson testified that

his basis of knowledge regarding PVC degradation "most likely [comes from] a combination of literature as well as standard textbooks that deal with aviation crash investigation." Doc. No. 86-1 at 43-44. When asked the basis for his opinion that PVC is commonly used as wire insulation, Dr. Nelson stated "it's electrical knowledge, electricity, those types of cases that we as forensic pathologists are involved in." Doc. No. 86-1 at 45.

Forensic pathology is "[t]he specific branch of medicine that establishes or interprets evidence dealing with diseases and disorders of the body, esp[ecially] those that cause death." Black's Law Dictionary (9th Ed. 2009). Dr. Nelson acknowledged that there is no pathological evidence that the pilots inhaled HCl. Doc. No. 86-2 at 31. Dr. Nelson explained that there was insufficient time before the Aircraft impacted the ground for physical evidence of HCl inhalation to appear. *Id*. In preparing his report, Dr. Nelson reviewed the autopsy reports, the NTSB's report, and three articles regarding PVC toxicity in fires. Doc. No. 99-22 at 2, 4 n. 2-4. 2. Dr. Nelson failed to clearly explain the basis for his knowledge concerning PVC wiring, how it degrades, and the byproducts it emits when degrading. Dr. Nelson failed to explain what facts and/or methodologies he may have used to conclude that HCl from burning PVC insulated wires likely incapacitated the pilots. Accordingly, it is recommended that the Court exclude Dr. Nelson from offering the Causation Opinion because he is not qualified to do so, the opinion is not supported by sufficient facts or sound scientific methodologies and it would not be helpful to the trier of fact. [11]

### 5. Mr. Stimpson.

Mr. Stimpson is an experienced pilot and mechanic who provides aviation accident reconstruction. Doc. No. 99-21 at 1-4. Mr. Stimpson has testified as an expert witness in the

---

[11] Dr. Nelson failed to explain what prior knowledge he was relying on in his report and in his deposition.

areas of accident investigation and reconstruction, piloting, aircraft maintenance and certification. Doc. No. 99-21 at 7. Accordingly, it is recommended that the Court find Mr. Stimpson is qualified to offer the Causation Opinion.

Mr. Stimpson opined that the cause of the crash was pilot incapacitation due to toxic fumes and smoke. Doc. No. 99-20 at 15. Like Dr. Birky, Mr. Stimpson's testing of exemplar PVC insulated wires in an exemplar fuselage showed that when burned, PVC insulated wires burn quickly, self propagate, and emit HCl. Doc. No. 99-20 at 12. Mr. Stimpson also relies on studies showing PVC insulated wiring burns quickly and releases toxic fumes. Doc. No. 99-20 at 12. In his deposition, Mr. Stimpson testified that he learned from his testing that a pilot would become incapacitated due to lack of visibility when there were large amounts of smoke in the cockpit. Doc. No. 85-2 at 30. Mr. Stimpson did not quantify the amount of smoke or test the concentration of HCl gas necessary to incapacitate the pilots. In his report, Mr. Stimpson fails to describe the testing performed with particularity, including the amount of PVC wiring used, the length of time the wire was exposed to a flame or arch, the ventilation system used, or a quantification of the amount smoke emitted over a particular length of time. Doc. No. 99-20 at 12. From his deposition testimony, it appears Mr. Stimpson's testing was done in an effort to observe the smoke generated in the exemplar fuselage and compare that to the smoke being emitted from the Aircraft prior to impact, in an effort to determine the actual conditions the pilots experienced prior to impact. Doc. No. 85-2 at 27-31. Based, in part, on a visual correlation between the smoke generated in testing to that witnesses described, Mr. Stimpson ultimately opines that "[t]he cause of this accident was the flight crew becoming incapacitated by toxic fumes and smoke created when PVC wiring is subject to a heat source for a short period of time and its ability to self propagate once a fire is ignited." Doc. No. 99-20 at 15. There are several

33

material variables that Mr. Stimpson fails to address in trying to correlate his visual testing results to those the witnesses observed.[12]  While the failure to address some variables may be better addressed through cross-examination, the undersigned is of the opinion that the analysis at issue has crossed the line into mere speculation.[13]  Based on the forgoing, it is recommended the Court find that Mr. Stimpson's Causation Opinion is not supported by sufficient facts or sound scientific principles and methodologies to be reliable or helpful to the trier of fact.[14]

### B.  RULE 403.

Rule 403, Federal Rules of Evidence, provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

*Id.*  Expert testimony that may otherwise be admissible under *Daubert* may still be excluded under Rule 403 if its probative value is substantially outweighed by its potential to confuse or mislead the jury, or if the testimony is cumulative or needlessly time consuming.  *Hendrix v. Evenflo Company, Inc.*, 255 F.R.D. 568, 579 (N.D. Fla. 2009) (citing *Hull v. Merck*, 758 F.2d 1474, 1477 (11th Cir. 1985).

In the Motion, Cessna presents a very general argument that Dr. Birky, Mr. Keifer, Mr. Feith, Dr. Nelson, and Mr. Stimpson should be precluded from offering the Causation Opinion because its admission into evidence would confuse and mislead the jury.  Doc. No. 81 at 23-24. In light of Cessna's conclusory statements on the issue of probative value and prejudicial effect,

---

[12] For example, Mr. Stimpson fails to address the variables in comparing the different perspective of the two observations and different conditions inside and outside the cabins.
[13] The analysis performed did not follow any sufficiently reliable methodology.
[14] This recommendation is limited to Mr. Stimpson's opinion that the crash was caused due to incapacitation of the pilots from inhalation of toxic fumes emitted by burning PVC insulated wiring.

it is recommended that the Court reserve resolution of Rule 403 issues until trial so that the factual basis for any such objection may be considered.  *See generally Sweitzer v. Oxmaster, Inc.*, 2011 WL 721907 at *8 (E.D. Pa. Mar. 2, 2011) (where both parties provided only conclusory or unsupported statement on Rule 403 issues in motion, Court reserved issue until trial).

## IV.    CONCLUSION.

Based upon the forgoing, it is **RECOMMENDED** that the Motion (Doc. No. 81) be **GRANTED in part and DENIED in part** as follows:

1.  **DENY** the Motion as to Dr. Birky;

2.  **DENY** the Motion as to Mr. Keifer because he did not offer the Causation Opinion in his report;

3.  **GRANT** the Motion as to Mr. Feith;

4.  **GRANT** the Motion as to Dr. Nelson;

5.  **GRANT** the Motion as to Mr. Stimpson; and

6.  Reserve ruling on Rule 403 issues until trial.

Failure to file written objections to the proposed findings and recommendations contained in this report **on or before Thursday, March 31, 2011** shall bar an aggrieved party from attacking the factual findings on appeal. **A response to any objection filed must be filed no later Thursday, April 7, 2011.**

**Recommended** in Orlando, Florida on March 24, 2011.


GREGORY J. KELLY
UNITED STATES MAGISTRATE JUDGE

Copies to:
Presiding District Judge
Counsel of record
Unrepresented parties